Peter C. ELLISON, on behalf of himself and all others similarly situated, Plaintiff,

v.

AMERICAN IMAGE MOTOR CO., INC., et al., Defendants.

No. 97 Civ 3608 (DC).

United States District Court, S.D. New York.

Feb. 19, 1999.

---

Weiss & Yourman, by Joseph H. Weiss, Jack I. Zwick, Richard A. Acocelli, New York City, Law Offices of Jeffrey S. Abraham, by Jeffrey S. Abraham, New York City, for Ellison and Individuals Similarly Situated.

Shearman & Sterling, by Stuart J. Baskin, Brian H. Polovoy, New York City, for Eversheds, David G.R. Carnegie, Michael J.T. Chamberlayne, Gordon A. Yablon.

Lehman & Eilen, by Howard S. Eilen, Timothy P. Kebbe, Uniondale, New York, for Northeast Securities, Inc., Vincent J. Iovine, Brian M. Fogel.

Andrew M. Lawler, P.C., by Andrew M. Lawler, New York City, for Wilson–Davis & Company, David S. Coleman.

## OPINION

CHIN, District Judge.

On March 13, 1997, the Securities and Exchange Commission (the "SEC") filed suit in this Court against Global Financial Traders ("Global"), BGSG Holding Corporation ("BGSG"), John J. Kenna, Michael R. Reilly, Vincent J. Iovine, and David S. Coleman for securities fraud. Two months later, plaintiff Peter C. Ellison, on behalf of himself and all others similarly situated, filed the instant suit, also alleging securities fraud. Ellison, however, attempts to cast a far wider net than did the SEC. Indeed, Ellison names at least twenty more defendants in this case than were named in the SEC's action.

Ellison seek damages against numerous corporate and individual defendants for allegedly fraudulent conduct in connection with the solicitation, sale, and distribution of the common stock (the "Stock") of American Image Motor Co. Inc. ("American Image"). Although the number of defendants in this case is vastly greater than in the SEC action, the

1. Robert Harman, also an Eversheds partner, was originally named as a defendant. The Court dismissed the claims against Harman without prejudice on December 2, 1997.

2. The Newsletters published and distributed by Global recommended approximately 20 to 30

conduct alleged here essentially mirrors the allegations in the SEC case.

The following three groups of defendants move to dismiss the complaint for failure to state a claim upon which relief can be granted pursuant to Fed.R.Civ.P. 12(b)(6) and for failure to plead fraud with particularity pursuant to Fed.R.Civ.P. 9(b): (1) The Law Firm Eversheds and its partners David G.R. Carnegie, Michael J.T. Chamberlayne, and Gordon A. Yablon (the "Eversheds Defendants")[1]; (2) Northeast Securities, Inc., Vincent J. Iovine, and Brian M. Fogel (the "Northeast Defendants"); and (3) Wilson–Davis & Co. and David S. Coleman (the "Wilson–Davis Defendants").

For the reasons stated herein, the motions to dismiss are granted in part and denied in part.

## BACKGROUND

### A. The Facts

This case concerns an alleged scheme to manipulate the market. In addition to the three groups of defendants moving to dismiss, the following three groups have also been named as defendants: (1) Global, BGSG, Kenna, Reilly, and Maria Sonner (the "Global Defendants"); (2) Harris, Ltd., Lybster, Ltd., Toryl, Ltd., and Minimum Effort, Ltd. (the "Liberian Corporations"); and (3) American Image and six of its officers and/or owners (the "American Image Defendants"). Ellison has also named "John Does 1–25," representing additional "unknown" parties "who are believed to have acted in concert with the defendants." (Cmplt. ¶ 34; see also id. ¶¶ 15–19, 25, 27–34).

Ellison contends that the Global and American Image Defendants used investment newsletters called The Daily Speculator and The Weekly Investor (the "Newsletters"), and other forms of solicitation, to tout shares of American Image, a "small cap"[2]

stocks. Many of these stocks were well-known companies. In addition, however, the Newsletters each contained a section entitled "Interesting Small Cap Stocks," in which the stock of "obscure" companies with low market capitalization was recommended to subscribers. Ameri-

company in which they had acquired substantial positions at low prices and then, acting through offshore companies, sold the shares in the open market at an artificially inflated price. Ellison contends generally that all the defendants "made millions of dollars in profits" from the Stock at the expense of Ellison and others similarly situated who "suffered millions of dollars of losses through defendants' wrongful acts." (*Id.* ¶ 1(c)).

### 1. The Parties

#### a. Plaintiff and Others Similarly Situated

Ellison, a subscriber of the Newsletters, purchased Stock on October 13, 1996 at $5.625 per share and on November 18, 1996 at $5.75 per share. (*Id.* ¶ 14 and Schedule A). The individuals similarly situated to Ellison ("Class Members") are alleged to have purchased American Image Stock during the period September 23, 1996 to March 13, 1997 (the "Class Period"). Class Members are also subscribers to the Newsletters, who relied to their detriment on alleged misrepresentations about American Image and its Stock.

#### b. American Image

American Image is a privately-held California company that was formed on August 20, 1996 for the purpose of acquiring Cycle Imagery, a California company that builds high quality, hand-crafted motorcycles. (*Id.* ¶¶ 27, 61). American Image "went public" on September 26, 1996 through a reverse merger with a shell company called Wall Street Information Services Holding, Inc. ("WSI"). WSI's name was changed to American Image Motor Company in conjunction with the merger. (*Id.* ¶ 61).

According to the complaint, as of September 1996, American Image had 12,500,000 shares of outstanding stock, "3,000,000 of which defendants considered to be 'public' and 9,500,000 of which were issued in American Image's acquisition of Cycle Imagery."

(*Id.*). The Stock was not registered with the SEC. (*Id.* ¶¶ 27(c), 61). American Image also "does not file annual, quarterly, or any other periodic reports with the SEC." (*Id.* ¶ 27(c)). The Stock is traded on the National Association of Securities Dealers Automated Quotations ("NASDAQ") over-the-counter bulletin board. (*Id.*).

#### b. Global Defendants

Kenna, Reilly, and Sonner are the officers and principals who controlled Global Financial Traders, Inc., the publisher of the Newsletters. Reilly and Kenna also owned BGSG Holding Corp. ("BGSG"), the company that was used to receive the proceeds of the alleged market manipulation scheme. (*Id.* ¶¶ 2–10; 15–19).

#### C. The Liberian Corporations

Kenna, Reilly, and Sonner were also the beneficial owners of Harris, Ltd. ("Harris"), Lybster, Ltd. ("Lybster"), Toryl, Ltd. ("Toryll"), and Minimum Effort, Ltd. ("Minimum Effort")—four Liberian Corporations through which Reilly, Kenna, and Sonner traded the Stock. (*Id.*; *see also id.* ¶ 25).

#### d. The Eversheds Defendants

The Law Firm Eversheds ("Eversheds") is headquartered in England, with offices in the British Channel Islands.[3] Carnegie, Chamberlayne, and Yablon are Eversheds partners and, in different combinations, officers of the Liberian Corporations. (*Id.* ¶ 26). The Liberian Corporations retained Eversheds to provide corporate services, and were "nominally headquartered" at Eversheds's offices in St. Helier, on the island of Jersey in the Channel Islands. (*Id.* ¶ 65; *see also id.* ¶ 26). The Eversheds Defendants opened trading accounts with Northeast and Wilson–Davis in the names of the Liberian Corporations. (*Id.* ¶ 26). The Eversheds Defendants also authorized wire transfers from the Liberian

---

can Image was such a company, and its stock was recommended to subscribers. (Cmplt.¶ 58).

**3.** Eversheds is the second largest law firm in England, with over a thousand lawyers representing individual and corporate clients in fifteen offices throughout Europe. (*See* Eversheds Mem. at 2–3).

Corporations' accounts at certain brokerages to other accounts both in and outside the United States. (*Id.* ¶¶ 113–14).

The professional services that Eversheds provided to the Liberian Corporations, and its involvement with these entities, are neither unusual nor illegal. Indeed, the allegations against the Eversheds Defendants concern nominee services that are expressly permitted under English law. (*See generally* Solicitors Act 1974, § 31; Solicitors Practice Rules 1990, Rule 5; Solicitors' Separate Business Code 1994, § 5(4); Solicitors' Incorporated Practice Rules 1988; Solicitors' Overseas Practice Rules 1990, Rules 9 and 18A; Eversheds Mem.App.Ex. B).

### e. *Broker Defendants*

Northeast and Wilson–Davis are broker-dealers that are registered with the SEC. Northeast acted as "market maker" for the Stock. (*Id.* ¶ 23). In addition, at relevant times, Iovine was employed by Northeast as its head trader, and was the account executive for the Liberian Corporations' trading accounts. (*Id.* ¶ 20). Fogel was Iovine's assistant "in trading" the Stock. (*Id.* ¶ 21). Coleman was head trader at Wilson–Davis for the Stock and was the account executive for the Liberian Corporations' trading accounts. (*Id.* ¶ 22). The two groups of defendants are referred to collectively as the "Broker Defendants."

### 2. *The Allegedly Fraudulent Scheme*

Ellison contends that during the Class Period, the Global Defendants, "acting in concert with others, swindled open market purchasers of the common stock of American Image." (*Id.* ¶ 2). The scheme operated as follows: (1) just prior to American Image's reverse merger, Kenna and Reilly "obtained a large, undisclosed position in Stock at a nominal price" in the name of the Liberian Corporations[4]; (2) the Liberian Corporations opened several trading accounts at Northeast and Wilson–Davis, giving Kenna and Reilly authority to trade in these accounts; (3) Global and American Image ag-

gressively promoted the sale of the Stock through the Newsletters, through a telemarketing campaign, and by disseminating allegedly false and misleading information about American Image to the public; and finally, (4) Kenna and Reilly sold their Stock to the investing public at an inflated price, thereby "defrauding the investing public of many millions of dollars." (*Id.* ¶¶ 3–9).

The vast majority of the allegations in the prolix complaint detail the ways in which the Global and American Image Defendants effectuated Kenna's and Reilly's fraudulent scheme. Indeed, the most detailed allegations in the complaint concern the misconduct of the Global and American Image Defendants, such as the purportedly systematic campaign to gain subscribers to the Newsletters; the elaborate effort to hold the Newsletters out as legitimate sources of investment advice; the misleading and fraudulent recommendation of the Stock to its burgeoning number of subscribers; the telemarketing efforts to convince investors to buy the Stock; and the campaign to convince investors to buy the Stock by disseminating numerous misleading disclosures. (*See id.* ¶¶ 3, 6, 27(c), 40–64, 73, 76–85, 87–96, 110, 118–35, 141 (allegations as to Global and American Image Defendants' wrongdoing spans more than twenty-five of the fifty-seven pages of factual allegations in the complaint)).

In addition to Global's recommendation of the Stock to its Newsletters' subscribers, American Image's promotional activity, and other explicit facts about Kenna and Reilly, Ellison alleges the involvement of a number of other defendants, including the Eversheds Defendants, Northeast Defendants, and Wilson–Davis Defendants. The factual allegations that appear in the complaint as to these additional defendants are summarized below.

In January 1996, the Liberian Corporations established brokerage accounts at Bear, Stearns Securities Corporations ("Bear Stearns"), acting as a clearinghouse broker for Northeast. The account forms were executed by Eversheds. (*Id.* ¶ 66). Kenna and

---

4. On September 25, 1996, the day before the announcement of the reverse merger, Kenna and Reilly acquired 633,325 shares of Stock for

$2,000. (*Id.* ¶ 62). Kenna and Reilly eventually acquired 1,350,000 shares of the Stock. (*Id.*).

Reilly also opened their own trading accounts at Bear Stearns in June 1996. (*Id.* ¶ 67). Eversheds authorized Kenna and Reilly to direct trades in the Liberian Corporations accounts. In fact, the complaint alleges that Kenna and Reilly directed trades in all five Bear Stearns accounts. (*Id.* ¶ 68).

In late September 1996, Iovine and Fogel began buying the Stock. (*Id.* ¶ 72). Iovine purchased 13,889 shares for his personal account and Fogel purchased 7,017 shares for his personal account. (*Id.* ¶ 74). As previously noted, Iovine was the registered representative on the five Northeast accounts, Fogel was Iovine's assistant on these accounts, and Northeast itself "acted as market maker" for the Stock. (*Id.* ¶ 100). At the same time that Iovine and Fogel were buying the Stock, Kenna and Reilly were also buying the Stock through the Liberian Corporations' accounts.

Kenna and Reilly had an "arrangement" with Iovine and Fogel, "whereby if Iovine and Fogel did not have Stock available for sale to another dealer, the Liberian Corporations would make Stock in the Liberian Corporations' accounts at Northeast available to Iovine and Fogel." (*Id.* ¶ 139). Moreover, Iovine and Fogel informed Kenna and/or Reilly when either of them would execute an "inter-dealer" transaction in the Stock. Kenna and Reilly instructed them "to raise, lower or maintain the quotations by Northeast for American Image Stock, and [they] followed these instructions." (*Id.* ¶ 140). If Fogel or Iovine could not contact Kenna or Reilly, Northeast made "limited trades with the understanding that the [Liberian Corporations'] accounts would make up any shortfalls at the end of the day." (*Id.*).

The Liberian Corporations also established a brokerage account at Wilson–Davis in May 1996. Again, the account forms were executed by Eversheds. Although they were not granted express written authority to direct trading in this account, "Reilly and Kenna ultimately directed trading" of the Stock in this account. (*Id.* ¶ 69). Coleman of Wilson–Davis purchased 7,000 shares of Stock for his own account from the Liberian Corporations' account at Wilson–Davis on September 25, 1996, and he purchased an additional 6,000

shares the next day. Coleman paid approximately $3 to $3.50 per share. (*Id.* ¶ 71). Just prior to these purchases, the Stock was purportedly trading at one cent per share. Coleman sold the shares he purchased in the next few days for approximately $4.50 to $5 per share. (*Id.* ¶ 71). While Coleman was buying the Stock for his own account, the Liberian Corporations' accounts were likewise buying the Stock. Ellison alleges that the "initial purchases" by the Liberian Corporations and these brokers "established a fictitious initial market price of approximately $3.00 per share for the Stock, which was subsequently further inflated by the promotional efforts of the Global Defendants ... and the manipulation of the Stock's price by the Broker Defendants and the Global Defendants." (*Id.* ¶ 75). After the initial sales, Global and American Image stepped up efforts to promote the Stock through the Newsletters, telemarketing, and allegedly misleading press releases about the company.

From October 4, 1996 through January 29, 1997, the Northeast Accounts sold a net amount of $2,933,164 worth of Stock. (*Id.* ¶ 100). From September 25, 1996 through January 16, 1997, Wilson–Davis earned approximately $42,521 in commissions on American Image trades, $29,340 of which Coleman earned. The combined trading by Northwest and Wilson–Davis accounted for approximately forty-seven percent of the total trading volume in the Stock for the period from September 30, 1996 through January 29, 1997. (*Id.* ¶ 104). From September 25, 1996 to March 6, 1997, the combined Northeast and Wilson–Davis accounts including Iovine's and Fogel's accounts sold approximately 1,020,452 shares of Stock. (*Id.* ¶ 102). The Northeast Defendants and the Wilson–Davis Defendants are alleged to have received "substantial commission income from the trading in the Stock." (*Id.* ¶ 107).

Proceeds from the sale of the Stock at both Northeast and Wilson–Davis were transferred to various Eversheds bank accounts in New York and elsewhere. (*Id.* ¶¶ 111–14). Eversheds authorized these transfers and wired itself $38,975 in partial payment of its fees. (*Id.*). Eversheds also

arranged for the proceeds of the Stock sales from the accounts at Northeast and Wilson–Davis "to be utilized to pay American Image the subscription price for the shares of Stock acquired by Reilly and Kenna, and issued to the Liberian Corporations' brokerage accounts." (*Id.* ¶ 113).

On March 13, 1997, Global announced that it had been named as the subject of an SEC enforcement action and that it would withhold further recommendations on American Image and other small cap stocks. (*Id.* ¶ 115). As a result, the trading price for the Stock fell below $1 share.

### B. *Prior Proceedings*

#### 1. *SEC Action*

The SEC filed a complaint against Global, BGSG, Kenna, Reilly, Iovine, and Coleman on March 13, 1997, asserting violations of § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b–5, 17 C.F.R. § 240.10b–5. *SEC v. Global Financial Traders, Ltd.,* No. 97 Civ. 1753(DC). The SEC contended that between August 1996 and March 1997, "Global, BGSG, Reilly and Kenna ... defrauded the investing public of at least $5.1 million through the sale of American Image ... common stock." (SEC Cmplt. ¶ 1). The SEC also alleged that Iovine and Coleman "effected large transactions in American Image stock .... primarily for a handful of related customer accounts controlled by, and whose beneficial owners are, Reilly and Kenna." (*Id.*). The *SEC v. Global Financial Traders* case is still pending in this Court although the majority of defendants have now settled with the SEC.

#### 2. *Ellison Action*

Ellison filed the instant suit on May 16, 1997 acknowledging that the case "is factually related to [the *SEC* action]." (Cmplt.¶ 1(d)). Ellison, however, states that the instant action "differs materially in that it names numerous additional defendants and alleges additional legal theories ... to secure a monetary recovery for [Ellison] and other persons similarly situated." (*Id.*).

These motions followed. On March 17, 1998, the Court granted Ellison's motion to appoint certain individuals as lead plaintiffs in the action and to approve the selection of Weiss & Yourman as lead counsel. No class has been certified to date.

### C. *Ellison's Allegations against Moving Defendants*

#### 1. *Securities Exchange Act of 1934 ("Exchange Act")*

##### a. *Section 10(b) and Rule 10b–5*

Ellison contends that all the moving defendants committed securities fraud in violation of § 10(b) of the Exchange Act and Rule 10b–5 by allegedly disseminating false information and by engaging in stock price manipulation.

##### b. *Section 20(a)*

Ellison contends that the Eversheds Defendants, Northeast Securities, and Wilson–Davis & Co. are also liable as control persons for the alleged § 10(b) and Rule 10b–5 violations pursuant to § 20(a) of the Exchange Act, 15 U.S.C. § 78t(a). The Eversheds Defendants as a whole are alleged to have "had the power and ability ... to control the operations of the Liberian Corporations with respect to" alleged § 10(b) violations by virtue "of their senior executive positions with and their relationships with the Liberian Corporations." (Cmplt.¶ 179). In addition, Eversheds itself is alleged to have "had the power and ability" to control the conduct of defendants Carnegie, Chamberlayne, and Yablon that allegedly violated § 10(b) by reason of its employment of or relationship with them. (*Id.* ¶ 182).

As to Northeast and Wilson–Davis, Ellison alleges that they are liable as control persons for the conduct of their respective brokers because they employed these individuals and, therefore, had the "power and ability" to control their conduct. (*Id.* ¶¶ 180–81).

#### 2. *Securities Act of 1933 (1933 Act)*

##### a. *Section 12(a)(1)*

Ellison contends that the Broker Defendants violated 12(a)(1) of the 1933 Act, 15 U.S.C. § 771(a)(1), by selling unregistered

Stock illegally. Ellison also contends that the Broker Defendants "solicited" the sale of Stock "by either making statements concerning the operations of American Image or creating fictitious trades in American Image Stock designed to convince [class members that the Stock] was registered with the SEC and was valuable." (*Id.* ¶ 145). Sales and solicitations by the Broker Defendants "were made for financial gain," and the Broker Defendants received "substantial commissions" as a result of their participation in the allegedly fraudulent scheme. (*Id.* ¶ 145(f)).

**b.** *Section 15*

Ellison also contends that the Eversheds Defendants, Northeast Securities, Inc., and Wilson–Davis & Co. are liable as control persons for the alleged violations of § 12(a)(1) of the 1933 Act pursuant to § 15 of the 1933 Act, 15 U.S.C. § 77o. The allegations supporting the contention that these defendants are liable as control persons mirror the allegations concerning the § 20(a) cause of action. (*See id.* ¶¶ 156, 158–59).

**3.** *Common Law Fraud*

In addition to securities fraud, Ellison contends that all the moving defendants in the case are liable for committing common law fraud. Ellison alleges that the Eversheds Defendants "were each a substantial motivating factor in the subject swindle by reason of their having formed, directed and housed the Liberian Corporations for the purpose of receiving shares of 'small cap' stocks and the unregistered Stock of American Image and selling same to the American investing public at inflated prices." (*Id.* ¶ 197). The Eversheds Defendants are further alleged to have been "active and knowing participants in the sale and purchase of the Stock and distribution of the unlawful gains achieved by the subject swindle." (*Id.*). The Broker Defendants are alleged to have "materially advanced and participated in the stock swindle scheme through their respective roles as market makers in the Stock and actively setting and maintaining artificial prices for the Stock." (*Id.* ¶ 196).

**DISCUSSION**

**A.** *Applicable Legal Standards*

**1.** *Exchange Act Violations*

**a.** *Section 10(b) and Rule 10b–5*

Section 10(b) of the Exchange Act prohibits the use of "any manipulative or deceptive" practice in connection with the purchase or sale of a security. 15 U.S.C. § 78j(b). To state a cause of action under § 10(b) and Rule 10b–5, Ellison must allege that: (1) in connection with a purchase or sale of securities; (2) each defendant, acting with scienter; (3) made a material false representation, or omitted to disclose material information, or engaged in a scheme to defraud; (4) to Ellison's detrimental reliance. *Grandon v. Merrill Lynch & Co.*, 147 F.3d 184, 189 (2d Cir.1998); *In re Blech Securities Litig.*, 961 F.Supp. 569, 580 (S.D.N.Y.1997).

Prior to the Supreme Court's decision in *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994), some courts held that § 10(b) reached not only those who actually made a material misstatement, but also those who aided and abetted such conduct. 511 U.S. at 169–70, 114 S.Ct. 1439 (citing cases); *see also Azrielli v. Cohen Law Offices*, 21 F.3d 512, 517 (2d Cir.1994) (primary liability may be imposed "not only on persons who made fraudulent misrepresentations but also on those who had knowledge of the fraud and assisted in its perpetration"). In *Central Bank*, the Supreme Court held that the Exchange Act "does not itself reach those who aid and abet .... [but] prohibits only the making of a material misstatement (or omission) or the commission of a manipulative act." *Central Bank*, 511 U.S. at 177, 114 S.Ct. 1439.

As a result, the only form of § 10(b) liability that remains viable is primary liability. *See Shapiro v. Cantor*, 123 F.3d 717, 720 (2d Cir.1997) ("[a]llegations of 'assisting,' 'participating in,' 'complicity in' and similar synonyms ... all fall within the prohibitive bar of *Central Bank*"). A primary violator is "one who 'participated in the fraudulent scheme' or other activity proscribed by the securities law." *SEC v. U.S. Environmental,*

*Inc.,* 155 F.3d 107, 111 (2d Cir.1998) (quoting *S.E.C. v. First Jersey Sec., Inc.,* 101 F.3d 1450, 1471 (2d Cir.1996), *cert. denied,* —— U.S. ——, 118 S.Ct. 57, 139 L.Ed.2d 21 (1997)). Whether a person is a primary violator rather than an aider and abettor "turns on the nature of his acts, not on his state of mind when he performed them." *Id.*

### b. *Scienter*

Like common law fraud claims, securities fraud claims must be pled with particularity pursuant to Fed.R.Civ.P. 9(b). *See Shields v. Citytrust Bancorp, Inc.,* 25 F.3d 1124, 1127–28 (2d Cir.1994). As to pleading scienter pursuant to Rule 9(b), the Second Circuit requires that a plaintiff " 'allege facts that give rise to a strong inference of fraudulent intent.' " *Chill v. General Elec. Co.,* 101 F.3d 263, 267 (2d Cir.1996) (quoting *Acito v. IMC-ERA Group, Inc.,* 47 F.3d 47, 52 (2d Cir. 1995)). The Second Circuit has held that the "scienter needed in connection with securities fraud is intent 'to deceive, manipulate, or defraud,' or knowing misconduct." *Press v. Chemical Investment Servs. Corp.,* 166 F.3d 529, 537 (2d Cir.1999) (quoting *First Jersey,* 101 F.3d at 1467).

In the Second Circuit, a strong inference of fraudulent intent can be established either: (1) " 'by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness'; or (2) 'by alleging facts to show that defendants had both motive and opportunity to commit fraud.' " *The High View Fund, L.P. v. Hall,* 27 F.Supp.2d 420, 426 (S.D.N.Y.1998) (quoting *Shields,* 25 F.3d at 1128).

In addition to Rule 9(b), a plaintiff also must satisfy the pleading requirements of the Private Securities Litigation Reform Act of 1995 ("PSLRA"), Pub.L. No. 104–67, 109 Stat. 737, 15 U.S.C. §§ 78u–4(b). The PSLRA, which was intended to "raise[ ] the bar at the pleading stage" in securities fraud cases, adopted the Second Circuit's strong inference standard. *Holding v. Nu–Tech Bio–Med, Inc.,* No. 98 Civ. 0764, 1999 WL 4922, at *4 (S.D.N.Y. Jan.5, 1999); *see also Castillo v. Dean Witter Discover & Co.,* No. 97 Civ. 1272, 1998 WL 342050, at *4 (S.D.N.Y. Jun. 25, 1998). A complaint in all federal securities fraud actions must now "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2).

While courts in this district agree that alleging conscious misbehavior or recklessness is sufficient to plead scienter under the PSLRA (*see U.S. Environmental,* 155 F.3d at 111), there is serious disagreement in this district as to whether the motive and opportunity standard articulated by the Second Circuit is sufficient under the PSLRA. *See In re Scholastic Corp. Sec. Litig.,* No. 97 Civ. 2447, 1998 WL 872422, at *8 (S.D.N.Y. Dec.15, 1998) (citing cases); *see also The High View Fund,* 27 F.Supp.2d at 426 n. 2 (citing cases).

Despite the split in the district courts, the Second Circuit recently reiterated the motive and opportunity standard in an opinion noting that the PSLRA "heightened the requirement for pleading scienter to the level used by the Second Circuit." *Press,* 1999 WL 49367, at *7. The *Press* court did not discuss or even mention the disagreement among district court judges regarding the motive and opportunity standard. Hence, it appears that the motive and opportunity standard meets the requirements of the PSLRA.

### b. *Section 20(a)*

Section 20(a) of the Exchange Act provides that "[e]very person who … controls any person liable [for a § 10(b) violation] … shall also be liable jointly and severally with and to the same extent as such controlled person." 15 U.S.C. § 78t(a).

To withstand a motion to dismiss a § 20(a) claim, Ellison must allege: (1) an underlying primary violation by the controlled person; (2) control over the controlled person; and (3) particularized facts as to the controlling person's culpable participation in the fraud perpetrated by the controlled person. *First Jersey,* 101 F.3d at 1472; *Novak v. Kasaks,* 26 F.Supp.2d 658, 662–63 (S.D.N.Y.1998); *Mishkin v. Ageloff,* No. 97 Civ. 2690, 1998 WL 651065, at *25 (S.D.N.Y. Sept.23, 1998); *Silva Run Worldwide Ltd. v. Gaming Lot-*

*tery Corp.,* No. 96 Civ. 3231, 1998 WL 167330, at \*13 (S.D.N.Y. Apr.8, 1998).

■ Control can be established "by showing that the defendant possessed 'the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise.' " *First Jersey,* 101 F.3d at 1472–73 (quoting 17 C.F.R. § 240.12b–2). Stock ownership is not the exclusive means of exercising control pursuant to § 20(a). Other means include business relationships, interlocking directors, family relationships, and the power to influence and control the activities of another. *See Baxter v. A.R. Baron & Co.,* No. 94 Civ. 3913, 1996 WL 709624, at \*6 (S.D.N.Y. Dec.10, 1996).

### 2. *1933 Act*

#### a. *Section 12(a)(1)*

Section 12(a)(1) of the 1933 Act provides that "[a]ny person who offers or sells a security in violation of section 77e of this title [section 5(c) of the 1933 Act] shall be liable ... to the person purchasing such security from him, who may sue either at law or in equity in any court of competent jurisdiction, to recover the consideration paid for such security with interest thereon ...." 15 U.S.C. § 77l(a)(1). Section 5(c) provides that "[i]t shall be unlawful for any person, directly or indirectly, to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy ... any security, unless a registration statement has been filed as to such security." 15 U.S.C. § 77e(c).

To state a claim under § 12(a)(1), Ellison must plead: (1) a sale or offer to sell securities by the defendant; (2) the absence of a registration statement; and (3) the use of the mails or facilities of interstate commerce in connection with the sale or offer. *Silva Run,* 1998 WL 167330, at \*8 (citing *In re Laser Arms Corp. Sec. Litig.,* 794 F.Supp. 475, 481 (S.D.N.Y.1989), *aff'd,* 969 F.2d 15 (2d Cir. 1992)).

■ Strict liability is imposed on those who offer or sell securities without complying with applicable statutory registration and prospectus requirements. *Pinter v. Dahl,* 486 U.S. 622, 647, ·108 S.Ct. 2063, 100 L.Ed.2d 658 (1988). Moreover, liability is " 'not limited to persons who pass title,' but includes anyone 'who successfully solicits the purchase, motivated at least in part by a desire to serve his own financial interests or those of the securities owner.' " *Shain v. Duff & Phelps Credit Rating Co.,* 915 F.Supp. 575, 577 (S.D.N.Y.1996) (quoting *Pinter* 486 U.S. at 643, 647, 108 S.Ct. 2063).

■ Section 12(a)(1), however, contemplates a buyer-seller relationship akin to traditional contractual privity. *Capri v. Murphy,* 856 F.2d 473, 478 (2d Cir.1988). Liability is only imposed on "the buyer's immediate seller; remote purchasers are precluded from bringing actions against remote sellers. Thus a buyer cannot recover against his seller's seller." *Pinter,* 486 U.S. at 644 n. 21, 108 S.Ct. 2063. In addition, liability cannot be imposed upon "those who merely assist in another's solicitation efforts." *Id.* at 651 n. 27, 108 S.Ct. 2063. Thus, "persons are not liable under § 12 ... unless they directly or personally solicit the buyer." *Shain,* 915 F.Supp. at 577.

#### b. *Section 15*

Section 15 of the 1933 Act states that "[e]very person who ... controls any person liable under section[ ] 77l of this title, shall also be liable jointly and severally with and to the same extent as such controlled person ...." 15 U.S.C. § 77o. Thus, § 15 imposes derivative liability upon persons who are control persons liable under § 13 of the 1933 Act.

■ The same considerations that apply in the context of control person liability under the Exchange Act apply to control person liability pursuant to the 1933 Act. *See Sloane Overseas Fund, Ltd. v. Sapiens Int'l Corp., N.V.,* 941 F.Supp. 1369, 1377–78 (S.D.N.Y. 1996) (same analysis for § 15 and § 20(a) claims); *In re Crazy Eddie Sec. Litig.,* 747 F.Supp. 850, 860–61 (E.D.N.Y.1990) (discussing § 15 and § 20(a) control person liability together); *Harrison v. Enventure Capital Group, Inc.,* 666 F.Supp. 473, 479 (W.D.N.Y.

1987) ("there is no basis for assuming that interpretation of control person liability pursuant to section 20(a) of the 1934 Act … should differ from that pursuant to section 15 of the 1933 Act") (citing *S.E.C. v. Management Dynamics, Inc.*, 515 F.2d 801, 812 (2d Cir.1975)).

#### c. *Rule 9(b)*

■ Unlike § 10(b) claims under the Exchange Act, § 12 claims under the 1933 Act do not necessarily sound in fraud. To the extent, however, that § 12 claims *are* grounded in fraud, the claims must be pled with particularity pursuant to Rule 9(b). *See Schoenhaut v. American Sensors, Inc.*, 986 F.Supp. 785, 795 and 795 n. 13 (S.D.N.Y. 1997) (citing cases); *Bruce v. Martin*, No. 90 Civ. 1002, 1992 WL 204395, at *4 (S.D.N.Y. Aug.14, 1992). Here, the 1933 Act claims sound in fraud. Indeed, Ellison has taken pains to paint a picture of the unregistered stock as being an integral part of the alleged stock manipulation. (*See* Cmplt. ¶ 145(a)–(g)). In addition, Ellison incorporates by reference into the § 12(a)(1) claim each of the preceding allegations in the complaint, which unambiguously sound in fraud. Accordingly, Rule 9(b) applies to the 1933 Act claims.

#### 3. *Common Law Fraud*

■ To state a claim for common law fraud under New York law, Ellison must allege "representation of a material existing fact, falsity, scienter, deception and injury." *New York Univ. v. Continental Ins. Co.*, 87 N.Y.2d 308, 639 N.Y.S.2d 283, 289, 662 N.E.2d 763 (1995) (internal quotation and citation omitted). The elements of common law fraud "are essentially the same as those which must be pleaded to establish a claim under § 10(b) and Rule 10b–5." *Scone Investments, L.P. v. American Third Market Corp.*, No. 97 Civ. 3802, 1998 WL 205338, at *10 (S.D.N.Y. Apr.28, 1998) (citing *Pits, Ltd. v. American Express Bank, Int'l*, 911 F.Supp. 710, 719 (S.D.N.Y.1996)); *see also Mishkin*, 1998 WL 651065, at *30 n. 16 (same).

#### B. *Application to Eversheds Defendants*

The Eversheds Defendants contend that the complaint should be dismissed as to them because it fails to pass muster under Rule 9(b) and because it fails to state a claim upon which relief can be granted. I agree. I address the claims against these defendants in turn, discussing both Rule 9(b) and the legal sufficiency of the complaint.

#### 1. *Section 10(b), Rule 10b–5, Common Law Fraud*

#### a. *Rule 9(b)*

■ The Eversheds Defendants maintain that Ellison has failed to plead the fraud claims with requisite particularity under Rule 9(b) and the PSLRA. I agree for three reasons. First, the complaint fails to sufficiently allege scienter as to any of the Eversheds Defendants. Second, the complaint fails to allege any fraudulent or manipulative act on their part. Third, the complaint aggregates these four defendants (three individuals and one entity) without differentiating what conduct is attributable to each.

#### 1) *Scienter*

■ As to scienter, and assuming the Second Circuit's pre-PSLRA standard applies, the complaint does not adequately allege either that these defendants had a motive to commit fraud or that there is evidence of conscious misbehavior or recklessness. Ellison contends that the Eversheds Defendants had the motive to commit fraud solely based on the "substantial fees" that they received or would receive. (*See* Cmplt. ¶¶ 58, 111). The allegations in the complaint, however, belie this contention. While it is true that the complaint asserts that the Eversheds firm received approximately $39,000 in partial payment of its fees for the professional services it provided to the Liberian Corporations, the complaint nowhere states that Eversheds sought or obtained anything other than its customary fees for services rendered. The receipt of professional fees does not provide an adequate "basis for drawing the necessary 'strong inference' of fraudulent intent." *Silva Run*, 1998 WL 167330, at *21 (citing *In re Health Manage-*

*ment, Inc. Sec. Litig.*, 970 F.Supp. 192, 202 (E.D.N.Y.1997)). Thus, the complaint fails to allege motive.

The complaint also fails to allege any concrete facts that would evidence fraudulent intent on the part of the Eversheds Defendants. *See, e.g., Shapiro,* 123 F.3d at 721 ("[l]iberally reading the complaint does not require ignoring specific factual allegations in order to broadly read sweeping equivocal assertions"); *In re Glenayre Tech., Inc. Sec. Litig.*, No. 96 Civ. 8252, 1998 WL 915907, at *3 (S.D.N.Y. Dec.30, 1998) ("[g]iven the conclusory nature of the plaintiffs contentions, the alleged facts do not give rise to the requisite strong inference of actual knowledge"). Indeed, nothing in the complaint suggests that these defendants did anything but fulfill their professional roles as English solicitors.

The only specific allegations against the Eversheds Defendants is that they: (1) set up the Liberian Corporations; (2) served as officers of the Liberian Corporations;[5] (3) executed account-opening documents for trading accounts with the Broker Defendants; (4) authorized Kenna and Reilly to direct trading in these accounts; and (5) authorized wire transfers of money from the Liberian Corporations' accounts with certain brokers to other accounts in and outside the United States. (Cmplt.¶¶ 7, 8, 25(a), 26, 65–69, 100, 105, 111, 114). These acts, standing alone or in combination, do not come close to satisfying the rigorous standard for pleading scienter. Rather, these allegations, if true, demonstrate only that the Eversheds Defendants lawfully established the Liberian Corporations and made arrangements for their clients with financial institutions.

Tellingly, there is no allegation in the complaint that the Eversheds Defendants knew (or were reckless in not knowing): (1) about Kenna's and Reilly's purportedly fraudulent scheme with American Image; (2) that the trading in the Liberian Corporations' ac-

counts was fictitious or meant to artificially inflate the price of the Stock; (3) about Global's operations or its aggressive solicitation efforts aimed at conning investors into buying the Stock; or (4) that transferring funds through their clients' trust accounts was for any improper purpose.

In short, there simply are no articulable facts that give rise to any inference, let alone a strong inference, of conscious misbehavior or recklessness. The fraud claims should be dismissed on this basis alone.

### 2) *Manipulative Act*

Just as the complaint lacks factual allegations giving rise to a strong inference of fraudulent intent, it also lacks specificity as to any "manipulative act" that the Eversheds Defendants are alleged to have effectuated. There is no allegation in the complaint of actual participation in the alleged fraudulent scheme on the part of any of these defendants. Accordingly, the fraud claims have not properly been pled and must be dismissed.

### 3) *Group Pleading*

■ Finally, the fraud claims should be dismissed because Ellison has failed to plead with specificity any of its allegations against any of the four Eversheds Defendants. " 'When fraud is alleged against multiple defendants, a plaintiff must plead with particularity by setting forth separately the acts complained of by each defendant.' " *Silva Run,* 1998 WL 167330, at *11 (quoting *Manela v. Gottlieb,* 784 F.Supp. 84, 87 (S.D.N.Y. 1992)). Rule 9(b) is "not satisfied by a complaint in which 'defendants are clumped together in vague allegations.' " *In re Blech Sec. Litig.,* 928 F.Supp. 1279, 1294 (S.D.N.Y. 1996) (quoting *Three Crown Ltd. Partnership v. Caxton Corp.,* 817 F.Supp. 1033, 1040 (S.D.N.Y.1993)); *see also Pallickal v. Technology Int'l, Ltd.,* No. 94 Civ. 5738, 1996 WL

---

**5.** Although Ellison makes much of the fact that the Eversheds Defendants were "officers" of the Liberian Corporations, the complaint nowhere states what position each individual actually held in these companies nor what involvement the individuals had in the management or day-to-day operations of the companies. According to the complaint, the Liberian Corporations were controlled by the Global Defendants. In the *SEC v. Global Financial Traders* case, discussed *supra,* the Eversheds lawyers are described as "nominal officers" of the Liberian Corporations. (SEC Cmplt. ¶ 26).

153699, at *1 (S.D.N.Y. Apr 3, 1996) ("[w]here there are multiple defendants, a complaint must identify which defendant is responsible for which act"). Because the complaint fails to separate these defendants with specific allegations of wrongdoing as to each one of them, the complaint does not pass muster under Rule 9(b).

For all these reasons, the Eversheds Defendants' motion to dismiss the fraud claims pursuant to Rule 9(b) is granted.

### b. *Legal Sufficiency*

■ Assuming the fraud claims in the complaint were well-pleaded, I would still dismiss them because Ellison has failed to plead a primary violation. Even construing the allegations in the complaint liberally, the complaint does no more than to allege that the Eversheds Defendants aided and abetted the Global and American Image Defendants in their fraud—conduct that is insufficient to state a § 10(b) or Rule 10b–5 violation.

For instance, Ellison admits that Kenna and Reilly were authorized to and did direct all trading in the Liberian Corporations' accounts. (*See* Cmplt. ¶¶ 68–69). Yet, he contends that the trading was "directed by the Eversheds Defendants acting *in concert with* the Global Defendants." (*Id.* ¶ 26). The Eversheds Defendants are alleged to have acted "in concert with" the Global Defendants five additional times in the complaint. (*Id.* ¶¶ 110, 120, 137, 163(d), 163(e)). Given the other allegations of the complaint, including the specific acts attributed to the Eversheds Defendants, the allegations against the Eversheds Defendants amount, at best, to allegations of "assisting," "participating in," "complicity in," and the like. The Eversheds Defendants cannot be held liable for conduct that amounts at most to aiding and abetting.

Accordingly, the § 10(b) and Rule 10b–5 claim against the Eversheds Defendants is dismissed as a matter of law. Likewise, the common law fraud claim against the Eversheds Defendants fails as a matter of law. *See Morse v. Weingarten*, 777 F.Supp. 312, 319 (S.D.N.Y.1991) (dismissing New York common law fraud claims after addressing § 10(b) claims because the elements of the

common law fraud claim are "substantially identical to those governing § 10(b)").

### 2. *Control Person Liability— § 20(a) and § 15*

Ellison also purports to state a claim against the Eversheds Defendants under both the Exchange Act and the 1933 Act on the theory that each of the individual lawyers was a "controlling person" of the Liberian Corporations and that the Eversheds firm is a "controlling person" of the individual lawyers. The control person claims fare no better than the fraud claims, however. As an initial matter, the pleading deficiencies discussed above apply with equal force here and these claims should be dismissed for failure to plead them with particularity.

Even if these claims were well pled, however, I would dismiss them as a matter of law for two reasons. First, the complaint fails to set forth a primary violation of the relevant securities laws. Second, the complaint fails to plead that the Eversheds Defendants "controlled" the Liberian Corporations. I address each point in turn.

### a. *Primary Violation*

■ For the reasons stated above, the complaint fails to state a primary violation of the Exchange Act under § 10(b) or pursuant to Rule 10b–5. Having failed to state a primary violation against the Eversheds lawyers, Ellison cannot make out a claim for control person liability against the firm pursuant to § 20(a).

The § 15 claim against the Eversheds Defendants fails because the complaint does not allege a primary violation of the 1933 Act by either the firm or the Liberian Corporations. As to the firm, Ellison has not asserted a § 12(a)(1) violation. As to the Liberian Corporations, Ellison fails to allege that he or any other Class Member purchased Stock from any of the Liberian Corporations. Rather, these corporations are alleged to have sold Stock through brokers who served as market makers. (Cmplt.¶¶ 69, 74). Even in a class action alleging violations of § 12(a)(1), it is insufficient to allege that securities reached the public through a market maker. *In re Laser Arms*, 794 F.Supp.

at 482. At a minimum, Ellison must allege when and from whom he purchased the Stock. *Dietrich v. Bauer,* No. 95 Civ. 7051, 1996 WL 709572, at *5 (S.D.N.Y. Dec.10, 1996).

### b. *Control*

 Even if Ellison had alleged a primary violation, the control person liability claims still fail. In *SEC v. First Jersey Sec., Inc.,* the Second Circuit held that to state a claim for control person liability, the plaintiff must "show ... control of the primary violator by the targeted defendant and show that the controlling person was in some meaningful sense a culpable participant in the fraud perpetrated by the controlled person." 101 F.3d at 1472 (internal quotations and citations omitted); *accord Novak,* 26 F.Supp.2d at 662–63; *Mishkin,* 1998 WL 651065, at *25.

A plaintiff may not allege "controlling person" status merely by reciting a corporate officer's title without alleging actual control and the nature of the controlling person's "culpable participation" in the fraud. Here, Ellison attempts to allege control person liability against the Eversheds Defendants based entirely on the generic allegation that the Eversheds lawyers were "officers" of the Liberian Corporations. There is no allegation in the complaint, however, of culpable participation by these individuals in the conduct ascribed to the Liberian Corporations. These generic allegations do not suffice. Nor does Ellison challenge the Eversheds Defendants' assertion that English Law authorizes solicitors to provide "nominee" services, *e.g.,* to act as nominal officers of a client company. (Eversheds Mem. at 15–16 citing Solicitors Act 1974; Solicitors Practice Rules 1990; Solicitors' Separate Business Code 1994; Solicitors' Incorporated Practice Rules 1988; and Solicitors' Overseas Practice Rules 1990).

Moreover, there is no allegation in the complaint that the Eversheds Defendants had the power to direct the Liberian Corporations. Aside from the naked assertion that the Eversheds Defendants were "officers" of the Liberian Corporations, the complaint is devoid of any allegation as to how these lawyers "controlled" these companies. In fact, the complaint alleges that these companies were controlled by Kenna and Reilly not the Eversheds Defendants. (*See* Cmplt. ¶¶ 8, 25(b), 68).

Accordingly, the Eversheds Defendants' motion to dismiss the control person liability claims against them is granted.

### C. *Application to Broker Defendants*

The Broker Defendants also contend that the complaint should be dismissed because it fails to pass muster under Rule 9(b) and because it fails to state a claim upon which relief can be granted. I disagree. Again, I address the claims against these defendants in turn, discussing both the legal sufficiency of the complaint and whether the allegations in the complaint pass muster under Rule 9(b).

### 1. *Section 10(b), Rule 10b–5, and Common Law Fraud*

The Broker Defendants contend that the § 10(b) and Rule 10b–5 claim should be dismissed because the complaint fails to: (1) allege a primary violation of § 10(b) and Rule 10b–5; (2) plead scienter; and (3) allege reliance and causation. For the reasons discussed below, I reject these arguments. While it is possible that some of the Broker Defendants' contentions will bear out once this litigation proceeds, I cannot determine at this stage in the litigation that the fraud claims fail as a matter of law.

### a. *Primary Violation and Scienter*

As to whether the alleged conduct by the Broker Defendants suffices to state a market manipulation claim in violation of § 10(b) and Rule 10b–5, I need only discuss a recent Second Circuit case that is on point. In *SEC v. U.S. Environmental, Inc.,* 155 F.3d 107 (2d Cir.1998), the Second Circuit reversed the district court's dismissal of the SEC's § 10(b) claim against a trader ("Romano") alleged to have engaged in a market manipulation scheme akin to the scheme alleged in the instant matter.

The *U.S. Environmental* district court dismissed the claim against Romano holding that he was alleged only to have been an

aider/abettor of securities violations because he "follow[ed] directions from [the promoter of the securities] in carrying out buy or sell orders" and "did not himself make wash sales, match orders, or use undisclosed nominees to artificially affect the price of securities." *Sec v. U.S. Environmental, Inc.,* 929 F.Supp. 168, 170 (S.D.N.Y.1996). Romano's principal contention on appeal, with which the district court agreed, is that he could not "be primarily liable under § 10(b) for following a stock promoter's directions to execute trades that [he] knew, or was reckless in not knowing, were manipulative." *U.S. Environmental,* 155 F.3d at 110. The Second Circuit disagreed.

The Second Circuit held that whether Romano was a primary violator rather than an aider and abettor "turns on the nature of his acts, not on his state of mind when he performed them." *Id.* at 111. In addition to finding that "the allegation that Romano executed trades that he knew were for a manipulative purpose sufficiently alleged scienter in a manner supporting § 10(b) liability," (*Id.*), the Second Circuit also concluded that the complaint "plain[ly] . . . alleged Romano to be a primary violator . . . . [because he] 'participated in the fraudulent scheme,' by effecting the very buy and sell orders that artificially manipulated [the] stock price upward." *Id.* at 112 (quoting *First Jersey,* 101 F.3d at 1471). "Indeed," the Second Circuit commented, "if the trader who executes manipulative buy and sell orders is not a primary violator, it is difficult to imagine who would remain liable after *Central Bank.*" *Id.*

■ The basic aim of the antifraud provisions of the securities laws is to "prevent rigging of the market and to permit operation of the natural law of supply and demand." *Varljen v. H.J. Meyers, Inc.,* No. 97 Civ. 6742, 1998 WL 395266, at *3 (S.D.N.Y. Jul.14, 1998). A plaintiff may thus state a cause of action under § 10(b) and Rule 10b–5 by alleging, among other things, "false statements in connection with the purchase or sale of securities or conduct that aims to alter the price of a security improperly through means other than false statements." *Id.* Like Romano, Iovine, Coleman and Fogel are alleged to have committed manipulative acts by, *inter alia,* effecting buy and sell orders to manipulate the price of the Stock. (*See* Cmplt. ¶¶ 71–72, 74–76, 136–41, 170–71).

Accordingly, I reject the Broker Defendants' contention that the complaint fails to allege a primary violation and/or fails to allege scienter. Accepting the factual allegations in the complaint as true, the broker-dealers involved with the Global Defendants committed acts in furtherance of the alleged market manipulation scheme. The conduct alleged gives rise to a strong inference of fraudulent intent.

### b. *Reliance and Causation*

■ The Broker Defendants also contend that the fraud claims must be dismissed because Ellison has failed to allege reliance and causation. I am skeptical whether Ellison will ultimately be able to prove either of these two elements because the allegations in the complaint are thin. It is not true, however, that the complaint fails to sufficiently allege these elements. The Broker Defendants argue that Ellison must, in essence, allege and *prove* reliance and causation to survive a motion to dismiss.

For instance, the Broker Defendants contend that Ellison must demonstrate unequivocally in the complaint that he relied on a well-developed, efficient market. The contention is misplaced. Not only do the Broker Defendants rely principally on non-controlling cases outside this circuit to support this argument, but the one case the Broker defendants cite from the Southern District of New York on this point held that "whether in fact [the stock] traded in an efficient market is a *question of fact,* [the resolution of which] must await presentation of further proof at trial." *In re Laser Arms,* 794 F.Supp. at 490 (emphasis added).

The complaint sufficiently alleges reliance against the Broker Defendants. It likewise sufficiently alleges causation. At this stage in the litigation, before discovery has even commenced, I am not prepared to hold as a matter of law that the allegations fail.

For all these reasons, the Broker Defendants' motion to dismiss the § 10(b) and Rule

10b–5 claim is denied. Likewise, because I find the complaint has adequately stated a § 10(b) and Rule 10b–5 violation against these defendants, the motion to dismiss the common law fraud claim is also denied.

### 2. *Section 12(a)(1)*

■ The Broker Defendants maintain that they are not liable to Ellison under § 12(a)(1) of the 1933 Act for three reasons: (1) they did not sell the Stock to Ellison or any Class Member; (2) they did not solicit purchases of the Stock; and (3) even if they did sell the Stock, they are exempt from liability pursuant to § 4(3)(A), 15 U.S.C. § 77(3)(A), the "dealer" exemption to 12(a)(1). At this juncture, I reject these arguments.

First, the complaint *does* allege that the Broker Defendants sold stock to Ellison and other Class Members. (*See* Cmplt. ¶ 147). Although the allegation is conclusory and stated in the alternative, there is no basis upon which to decide at this stage in the litigation that the allegation is untrue. Indeed, accepting the other factual allegations about the Broker Defendants, I find that the complaint implicitly alleges that the Stock was sold by the Broker Defendants to Class Members within the meaning of § 12(a)(1). Second, because the complaint sufficiently alleges that the Broker Defendants actually sold unregistered stock to Ellison and other Class Members, it is irrelevant whether Ellison's allegation that the Broker Defendants also solicited Stock purchases suffices. Indeed, liability under § 12(a)(1) can be based upon selling *or* solicitation. Finally, the Broker Defendants have failed to demonstrate, as a matter of law, that the "dealer" exemption applies here. Having carefully considered the parties' arguments as to the applicability of this exemption, I can only conclude that there are legitimate issues as to whether it applies—issues that I simply cannot decide on a motion to dismiss.

Accordingly, the Broker Defendants' motion to dismiss the § 12(a)(1) claim is denied.

### 3. *Control Person Liability— § 15 and § 20(a)*

■ Having concluded that the Broker Defendants may be liable pursuant to § 12(a)(1) of the 1933 Act, I must also conclude that Northeast and Wilson–Davis may be liable as control persons under § 15 of the 1933 Act. As the employers of Iovine, Fogel, and Coleman, Northeast and Wilson–Davis cannot seriously contend that they did not control these individuals as a matter of law. Given the allegations in the amended complaint, these entities also cannot seriously dispute culpable participation. Thus, the complaint sufficiently states a § 15 claim against Northeast and Wilson–Davis.

Likewise, the complaint sufficiently states a claim against these entities under § 20(a) of the Exchange Act. The complaint alleges a primary violation of § 10(b) by Iovine, Fogel, and Coleman. As the employers of these individuals, and considering the factual allegations in the complaint, Northeast and Wilson–Davis cannot seriously contend that they did not control their employees or that they were not culpable participants in the alleged scheme. Should Ellison be able to prove liability against these individuals for the alleged violation of § 10(b) and Rule 10b–5, Northeast and Wilson–Davis could be held liable as control persons pursuant to § 20(a).

Accordingly, the motion to dismiss the control person liability claims against Northeast and Wilson–Davis is denied.

### CONCLUSION

For the reasons stated herein, the Eversheds Defendants' motion to dismiss is granted in its entirety, and all the claims against the Eversheds Defendants are dismissed with prejudice. The Northeast and Wilson–Davis Defendants' motions are denied. The remaining parties in the case shall attend a status conference at 500 Pearl Street, Courtroom 11A, New York, New York on March 19, 1999 at 11:00 a.m.

SO ORDERED.