**POLAR INTERNATIONAL BROKERAGE CORP., Christopher Corroon, Peter Corroon and Faith V. Hyndman, on their own behalf and on behalf of all similarly situated shareholders of Willis Corroon Group, PLC, Plaintiffs,**

v.

**John REEVE, Thomas Colraine, Brian D. Johnson, George F. Nixon, Kenneth H. Pinkston, Michael R. Rendle, Joseph M. Rodgers, William A. Schreyer, Allen Sykes, Raymond G. Viault, Patrick Lucas, Willis Corroon Group,**

226

PLC, Trinity Acquisition, PLC, Kohlberg Kravis Roberts & Co., L.P., Guardian Royal Exchange, Royal & Sunalliance, the Chubb Corporation, the Hartford Financial Services Group, Inc., Travelers Property Casualty Corp., Warburg Dillon Read, Inc., Chase Manhattan Bank and HSBC Investment Bank, Defendants.

No. 98 Civ. 6915(SAS).

United States District Court,
S.D. New York.

June 27, 2000.

Samuel P. Sporn, Jay P. Saltzman, Schoengold & Sporn, P.C., New York, NY, Lawrence Deutsche, Deborah Fleigelb-

aum, Berger & Montague, P.C., Philadelphia, PA, for Plaintiffs.

Paul C. Curnin, Frederick A. Morton, Jr., Christina E. Paglia, Simpson Thacher & Bartlett, New York, NY, for Defendants.

Robert C. Myers, Paul B. Carberry, Dewey Ballantine LLP, New York, NY, for Insurance Company Defendants.

### OPINION AND ORDER

SCHEINDLIN, District Judge.

Plaintiffs Polar International Brokerage Corp. ("Polar"), Christopher Corroon, Peter Corroon and Faith V. Hyndman bring this securities fraud class action against various corporate and individual defendants.[1] Plaintiffs and the purported class members are former shareholders of defendant Willis Corroon. They allege that defendants violated sections 13(e) and 14(e) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78m(e), 78n(e), by making material misrepresentations and omissions in connection with a 1998 tender offer by defendant Trinity for outstanding shares of Willis Corroon. Plaintiffs also bring related state law claims for breach of fiduciary duty, violation of New York Business Corporations Law § 717 ("BCL § 717") and common law fraud.

Both the federal and state law claims assert that defendants' alleged fraudulent acts concealed the inadequacy of Trinity's tender offer and, as a result, misled Willis Corroon shareholders who unwittingly approved the transaction and tendered their shares for insufficient consideration. The state law claims additionally assert that the Individual Defendants breached their fiduciary duties to Willis Corroon shareholders by failing to obtain a superior tender offer for Willis Corroon shares.

Defendants now move, pursuant to Federal Rules of Civil Procedure 12(b)(6) and 9(b), to dismiss plaintiffs' First Amended Complaint ("Complaint") for failure to state a claim upon which relief may be granted and for failure to plead fraud with particularity. For the reasons that follow, defendants' motions are granted in their entirety.[2]

### I. Standard of Review

Dismissal of a complaint for failure to state a claim pursuant to Rule 12(b)(6) is proper only where "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief." *Harris v. City of N.Y.*, 186 F.3d 243, 247 (2d Cir.1999). "The task of the court in ruling on a Rule 12(b)(6) motion is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." *Cooper v. Parsky*, 140 F.3d 433, 440 (2d Cir. 1998) (internal quotations omitted). Thus, to properly rule on such a motion, the court must accept as true all material facts alleged in the complaint and draw all reasonable inferences in the nonmovant's favor. *See Harris*, 186 F.3d at 247. Never-

---

1. Defendants Willis Corroon Group, plc ("Willis Corroon"), Trinity Acquisition, plc ("Trinity") and Kohlberg Kravis Roberts & Co., L.P. ("KKR") are referred to individually throughout this Opinion. The remaining defendants are placed into three groups and referred to collectively as follows. Defendants John Reeve, Thomas Colraine, Brian D. Johnson, George F. Nixon, Kenneth H. Pinkston, Michael R. Rendle, Joseph M. Rodgers, William S. Schreyer, Allen Sykes, Raymond G. Viault and Patrick Lucas compose the "Individual Defendants". Defendants Warburg Dillon Read, Inc., Chase Manhattan Bank and HSBC Investment Bank compose the "Invest-

ment Bank Defendants". Defendants Guardian Royal Exchange, Royal & SunAlliance, The Chubb Corporation, The Hartford Financial Services Group, Inc. and Travelers Property Casualty Corp. compose the "Insurance Company Defendants".

2. Willis Corroon, Trinity, KKR, the Individual Defendants and the Investment Bank Defendants submitted a joint motion to dismiss the Complaint. The Insurance Company Defendants filed a separate motion to dismiss the Complaint.

theless, "[a] complaint which consists of conclusory allegations unsupported by factual assertions fails even the liberal standard of Rule 12(b)(6)." *De Jesus v. Sears, Roebuck & Co.*, 87 F.3d 65, 70 (2d Cir. 1996) (internal quotations omitted).

In deciding a Rule 12(b)(6) motion, the district court must limit itself to facts stated in the complaint, documents attached to the complaint as exhibits or documents incorporated in the complaint by reference. *See Dangler v. New York City Off Track Betting Corp.*, 193 F.3d 130, 138 (2d Cir.1999). However, in securities fraud actions, the court "may review and consider public disclosure documents required by law to be and which actually have been filed with the SEC. . . ." *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47 (2d Cir.1991). *See also Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991); *Salinger v. Projectavision, Inc.*, 934 F.Supp. 1402, 1405 (S.D.N.Y.1996).

Rule 9(b) sets forth additional pleading requirements with respect to allegations of fraud. Rule 9(b) requires that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." But, under Rule 9(b), "[m]alice, intent, knowledge and other condition of mind of a person may be averred generally."

Securities fraud actions are subject to the requirements of Rule 9(b). *See Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1127 (2d Cir.1994). However, the Private Securities Litigation Reform Act of 1995 (the "PSLRA"), 15 U.S.C. § 78u–4, heightened that Rule's requirement for pleading scienter in the securities fraud context. *See* 15 U.S.C. § 78u–4(b)(3)(A); *see also Press v. Chemical Inv. Servs. Corp.*, 166 F.3d 529, 537–38 (2d Cir.1999). As a result, in securities fraud actions, scienter may not be averred generally.

Rather, plaintiffs must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Press*, 166 F.3d at 538 (quoting 15 U.S.C. § 78u–4(b)(3)(A)).

## II. Background

Unless otherwise indicated, the facts and allegations set forth below are drawn from the Complaint and certain public disclosure documents. They are presumed true for purposes of resolving defendants' motions.

### A. Factual Background

#### 1. Parties

Willis Corroon is an international insurance brokerage firm that offers insurance, reinsurance, risk management and loss control services to corporate and institutional clients worldwide. Complaint ¶ 9.[3] Although the firm is organized under the laws of England and Wales, it is licensed to conduct business in the United States, and American Depository Shares[4] of Willis Corroon trade on the New York Stock Exchange. *Id.* The Individual Defendants were officers and directors of Willis Corroon at all times relevant to the instant action. *Id.* ¶ 20.

Defendant KKR is a leading private equities firm which identifies long-term equity investments; negotiates, structures and arranges financing for such investments; and monitors the value of such investments over time. *Id.* ¶ 11. KKR is managed by approximately thirty persons who operate from offices in New York, New York. *Id.*

Defendant Trinity is a public limited company organized under the laws of England and Wales. 7/27/98 Trinity Schedule

---

**3.** For the sake of simplicity, Willis Corroon is referred to in the present tense. However, the firm presumably no longer exists as an independent entity.

**4.** An American Depository Share ("ADS") represents the equivalent of five ordinary shares of Willis Corroon. An American Depository Receipt ("ADR") represents ownership of an ADS.

14D–1 & Schedule 13D ("Tender Offer Statement") at 8.[5] Trinity was formed at the direction of KKR for the express purpose of acquiring Willis Corroon. Complaint ¶ 10. Trinity maintains offices in New York, New York. *Id.*

The Insurance Company Defendants are investors and equity partners in Trinity. *Id.* ¶¶ 12–16. Three of the five Insurance Company Defendants maintain offices in New York, New York. *Id.* ¶¶ 14–16.[6] The Investment Bank Defendants are also investors and equity partners in Trinity. *Id.* ¶¶ 17–19. The Investment Bank Defendants all maintain offices in New York, New York. *Id.*

Plaintiffs Polar, Christopher Corroon, Peter Corroon and Hyndman were, at all relevant times, owners of Willis Corroon securities. *Id.* ¶ 8.

### 2. Trinity Tender Offer

In December 1997, KKR contacted Willis Corroon to discuss the possibility of a business transaction between the two firms. 7/27/98 Recommended Cash Offer for Willis Corroon Group plc on Behalf of Trinity Acquisition plc (the "Solicitation"), Ex. A to 12/10/99 Affidavit of Defendants'

Counsel Paul Curnin in Support of Defendants' Motion to Dismiss Plaintiffs' First Amended Class Action Complaint ("Curnin Aff."), at 97.[7] After six months of discussions and financial due diligence, KKR proposed that Trinity, its indirectly-owned subsidiary, acquire Willis Corroon at a tender offer price of 200 pence per share (the "Offer"). *Id.* A committee of five independent directors was formed to consider the Offer on behalf of Willis Corroon shareholders. *Id.* at 6.[8] On July 21, 1998, the independent directors "unanimously decided that the terms [of the Offer] were fair and reasonable and that they would recommend that all holders of Willis Corroon securities accept the [O]ffer." *Id.* at 98. The independent directors based their decision on multiple factors, including the advice of Willis Corroon's financial adviser, Deutsche Bank. *Id.* at 7–10. The following day, July 22, Trinity and Willis Corroon publicly announced that Trinity would acquire Willis Corroon in a cash transaction valued at $1.4 billion dollars. Complaint ¶ 29; 7/22/98 Press Release Issued by Willis Corroon and Trinity ("July 1998 Press Release"), Ex. A to 12/9/99 Affidavit of Defendants' Counsel Robert C. Myers ("Myers Aff.").[9] According to the an-

5. The Tender Offer Statement is attached as Exhibit A to the October 16, 1998 Affidavit of Defendants' Counsel Paul C. Curnin in Opposition to Plaintiff's Expedited Motion Seeking to Enjoin the Completion of the Acquisition of Willis Corroon. Although Curnin submitted his October 1998 affidavit in connection with prior proceedings, *see infra* Part II.B., this Court may properly consider the Tender Offer Statement in resolving the pending motions because it is explicitly and repeatedly referenced in the Complaint. *See, e.g.,* Complaint ¶¶ 1, 25, 33, 35, 37, 45. In addition, the Tender Offer Statement is a required public disclosure document. *See supra* Part I.

6. The remaining Insurance Company Defendants—Guardian Royal Exchange and Royal & SunAlliance—do not have offices in New York. Complaint ¶¶ 12–13. Accordingly, in addition to Rules 12(b)(6) and 9(b), both companies seek dismissal pursuant to Rule 12(b)(2) for lack of personal jurisdiction. *See* Memorandum of Law of the Insurance Company Defendants In Support of their Motion to Dismiss ("ICD Mem.") at 2, 8–10.

7. Like the Tender Offer Statement, this Court may properly consider the Solicitation because it is incorporated by reference in the Complaint. *See, e.g.,* Complaint ¶¶ 1, 25, 37. In addition, the Solicitation is attached as Exhibit (a)(1) to the publicly filed Tender Offer Statement. *See supra* note 5. Finally, the Solicitation was necessarily distributed to plaintiffs and purported class members in connection with the Offer.

8. The independent directors included Individual Defendants Rendle, Rodgers, Sykes and Viault. Solicitation, Ex. A to Curnin Aff., at 6. The fifth independent director, Christopher D. Outram, is not named as a defendant in this action.

9. The July 1998 Press Release is incorporated by reference in the Complaint, *see, e.g.,* Complaint ¶¶ 29, 30, and attached as Exhibit (a)(8) to the publicly filed Tender Offer Statement.

nouncement, the two companies would be merged into a new entity named the Trinity Group, plc. Complaint ¶ 29.

Detailed information concerning the Offer, together with the Offer itself, was circulated to shareholders via the July 27, 1998 Solicitation. Solicitation, Ex. A to Curnin Aff. As set forth above, Trinity agreed to acquire the outstanding equity of Willis Corroon for 200 pence per share or £10 (approximately $16.00) per ADS. Complaint ¶ 29; Solicitation, Ex. A to Curnin Aff., at 7. The Offer price represented a 12% premium over the closing price of Willis Corroon stock on July 21, 1998, and a 29% premium over the average closing price of Willis Corroon stock during the six months immediately preceding the Trinity Offer. Complaint ¶ 29; Solicitation, Ex. A to Curnin Aff., at 8.[10]

The Solicitation disclosed that seven senior executives of Willis Corroon—Individual Defendants Reeve, Colraine, Johnson, Nixon, Pinkston, Schreyer and Lucas—had "agreed in principle to invest in the Trinity Group alongside the KKR Fund and the Insurance Companies." Solicitation, Ex. A to Curnin Aff., at 6. According to the Solicitation, it was because of these executives' personal interest in the Offer that a committee of independent directors was selected to evaluate the fairness of the Offer. Id.

The Solicitation further disclosed that, prior to the commencement of the Offer, Trinity purchased 42,558,502 Willis Corroon shares from corporate shareholder Phillips & Drew Fund Management Limited ("Phillips & Drew") at a price of 201.75 pence per share. Id. at 7; Complaint ¶¶ 31–32.[11] In addition, the seven interested executives, the five independent directors and Phillips & Drew had irrevocably agreed to tender their Willis Corroon shares—in the case of Phillips & Drew, its remaining Willis Corroon shares—to Trinity pursuant to the Offer. Solicitation, Ex. A to Curnin Aff., at 7.[12] Therefore, at the time the Offer commenced, Trinity had already effectively acquired 19.7% of Willis Corroon's issued share capital. Id.[13]

Finally, the Solicitation included a letter to Willis Corroon shareholders from the independent directors unanimously recommending the Offer and setting forth the reasons for their recommendation. Id. at

**10.** In addition to 200 pence per share, the Offer provided that tendering shareholders would receive a third interim dividend of 1.75 pence per share payable on October 1, 1998. Solicitation, Ex. A to Curnin Aff., at 7; see also Complaint ¶ 32. Accordingly, tendering shareholders received total consideration of 201.75 pence per share. Complaint ¶ 32.

**11.** This pre-Offer price combined the anticipated 200 pence per share Offer price and the 1.75 pence per share interim dividend. Solicitation, Ex. A to Curnin Aff., at 7; Complaint ¶¶ 31–32.

**12.** The irrevocable undertaking by Phillips & Drew ceased to be binding in the event Willis Corroon received a superior tender offer. Solicitation, Ex. A to Curnin Aff., at 7.

**13.** Plaintiffs appear to misapprehend the nature of the directors' irrevocable undertakings. The Complaint asserts:

As set forth in the terms of the Offer in the July 22, 1998 press release, "seven senior executives of Willis Corroon, including the Executive Directors, [will receive in exchange for irrevocable undertakings to accept, or procure the acceptance of, the Offer] ... 1,164,481 Willis Corroon Shares and 94,604 Willis Corroon ADSs."

Complaint ¶ 30 (alteration in original). The bracketed language inserted by plaintiffs implies that Trinity promised to give Willis Corroon executives thousands of shares of Willis Corroon in exchange for the executives' irrevocable undertakings to accept the Offer. Not only is such a construction illogical, but it distorts the plain language of the July 1998 Press Release and the Solicitation. In contrast to plaintiffs' rendering, those documents clearly state that "irrevocable undertakings to accept, or procure the acceptance of, the Offer have been received from ... seven senior executives of the Willis Corroon Group ... in respect of 1,164,481 Willis Corroon Shares and 94,604 Willis Corroon ADSs." Solicitation, Ex. A to Curnin Aff., at 7. In other words, prior to the Offer, certain Willis Corroon executives irrevocably committed to tender their shares to Trinity.

6–10. Among other things, the letter states:

> The Independent Directors of Willis Corroon, who have been so advised by Deutsche Bank, financial adviser to Willis Corroon, consider the terms of the Offer to be fair and reasonable. In providing advice to the Independent Directors, Deutsche Bank has taken account of the Independent Directors' commercial assessments. Accordingly, the Independent Directors unanimously recommend all Willis Corroon Securityholders to accept the Offer. . . .

*Id.* at 10; *see also* Complaint ¶ 37.

By September 25, 1998, more than 90% of Willis Corroon equity holders had tendered their ownership interests to Trinity. Complaint ¶ 70.[14] On November 6, 1998, Trinity acquired the remaining outstanding Willis Corroon equity through a U.K. process known as "compulsory acquisition." *Id.* ¶¶ 70, 72.[15]

**B. Procedural Background**

On July 28, 1998, one day after the Offer commenced, plaintiff Polar brought action in New York State Supreme Court against the same defendants named here. The state court complaint alleged that the Offer price was wholly inadequate and asserted claims for breach of fiduciary duty, violation of BCL § 717 and common law fraud. *See* 7/28/98 State Court Complaint, Ex. B to Curnin Aff.[16]

Two months later, on September 30, 1998, Polar filed a substantially identical action in this Court. In addition to the common law claims alleged in state court, however, the federal court complaint included a claim for securities fraud under § 14(e) of the Exchange Act.

On October 9, 1998, Polar filed a motion for expedited relief seeking to enjoin an October 19 meeting of Willis Corroon shareholders. In its motion papers, Polar asserted that defendants failed to circulate Deutsche Bank's "written fairness opinion". Polar claimed that the written fairness opinion was material to the equity holders' decisions regarding whether to approve the Offer. In response to Polar's motion, counsel for defendants informed Polar that Deutsche Bank had presented its fairness opinion orally and that no written fairness opinion had ever been issued.

On October 14, this Court declined to enjoin the shareholders meeting, finding that the meeting itself posed no threat of harm to Polar. However, a hearing was scheduled for October 21 to determine whether injunctive relief was appropriate in light of Trinity's planned compulsory acquisition of the remaining Willis Corroon shares. On the morning of the hearing, counsel informed the Court that the parties had reached a settlement.

In an order dated January 13, 1999, I certified a plaintiff class for purposes of the proposed settlement and directed plaintiff's counsel to provide notice to the class. A fairness hearing was held on March 8, 1999.

---

14. According to defendants, more than 93% of all Willis Corroon equity holders tendered their ownership interest in response to the Offer. Curnin Aff. ¶ 6. On September 7, 1998, the right to withdraw tendered shares expired and the tendered shares were accepted. *Id.* ¶ 7. On September 16, Trinity paid approximately $1.4 billion for the tendered shares. *Id.*

15. Defendants describe the compulsory acquisition process as follows:

> On November 6, 1998, the remaining roughly seven percent of Willis Corroon equity was acquired by means of a process known as compulsory acquisition under U.K. law. In this ministerial process, undertaken in the U.K., the remaining equity ceased to be outstanding and cash in an amount equivalent to the tender offer price was set aside and held by a transfer agent until claimed by the former owners of the remaining seven percent of the equity.

Curnin Aff. ¶ 10.

16. On January 11, 1999, Polar voluntarily discontinued the state court action with prejudice.

Following the fairness hearing, and after reviewing submissions by both parties, I rejected the proposed settlement concluding that while it was of great benefit to defendants and plaintiff's counsel, it was of negligible benefit to the plaintiff class. *See Polar Int'l Brokerage Corp. v. Reeve,* 187 F.R.D. 108 (S.D.N.Y.1999).[17] In declining to approve the settlement offer, I noted that Polar's substantive federal and state law claims appeared to have little merit and warned that "if plaintiff chooses to proceed, it should be mindful of the

PSLRA's requirement of a mandatory Rule 11 review at the conclusion of any case." *Id.* at 120 n. 10.[18]

On October 8, 1999, plaintiffs filed the instant class action Complaint. Plaintiffs seek to represent a class of persons who owned Willis Corroon securities at the time of the Offer.

## C. Allegations of the Complaint

The Complaint sets forth five claims for relief. Claim I alleges that defendants

---

17. Under the terms of the proposed settlement, in return for releasing all of its claims against defendants, the plaintiff class was "to receive no monetary payment or other benefit other than the disclosure of" certain documents and information which allowed plaintiff's counsel "to independently conclude that the consideration for [Willis Corroon shares paid] to Plaintiff and members of the Class was not unfair or inadequate." *Polar,* 187 F.R.D. at 111–12. At the same time, plaintiff's counsel sought an award of $200,000 in attorneys' fees. *Id.* at 112.

18. I also note with grave concern the drastic inconsistency of the positions taken by plaintiffs' counsel in this litigation. In March 1999, in connection with the proposed settlement agreement, plaintiffs' counsel represented to this Court and to the entire plaintiff class that

> [w]hile Plaintiff originally contended that holders of the ADRs were to receive an inadequate consideration for their holdings, discovery and examination of the documents, methodology, and witnesses adduced no evidence that said consideration was unfair or inadequate. The financial expert engaged by Plaintiff's Counsel has likewise concluded that such consideration is not inadequate and unfair in the circumstances.

Notice of Class Action Determination, Proposed Settlement and Hearing Thereon, Ex. G to 3/3/99 Affidavit of Plaintiff's Counsel Samuel P. Sporn in Support of Proposed Settlement ("Sporn Aff."), at 3; *see also id.* at 2 ("Plaintiff's Counsel and Plaintiff have satisfied themselves, in consultation with their independent expert, that the payment of 200 pence per underlying share of Willis Corroon stock ... was not unfair or unreasonable."); *id.* at 3 (in determining that Offer was not unfair, plaintiff's counsel "retained an expert in the field of securities valuation", "examined extensive documents" and deposed "high-ranking" officials of Willis Corroon and

Deutsche Bank); Transcript of 3/8/99 Fairness Hearing at 7 (plaintiff's counsel informed Court that Offer was "fair, not only as of July 1998 but continued to be fair up to December 1998 which was the time of the consummation of the [O]ffer").

Despite these previous unequivocal statements of fairness, plaintiffs' counsel now contend that the Offer price was "grossly inadequate", and that Willis Corroon shareholders were "frozen out for inadequate consideration." Complaint ¶¶ 1, 35. Indeed, the gravamen of the Complaint is that defendants' fraudulent acts caused plaintiffs to approve and accept an unfair and unreasonable tender offer. Thus, plaintiffs' counsel has directly contradicted their prior statements.

Under the doctrine of judicial admissions, plaintiffs' counsel would normally be bound by their earlier representations regarding the fairness of the Offer and precluded from controverting those statements here. *See Purgess v. Sharrock,* 33 F.3d 134, 144 (2d Cir.1994); *Maurizio v. Goldsmith,* 84 F.Supp.2d 455, 464 (S.D.N.Y.2000). However, in the May 17 Opinion, I questioned the veracity of counsel's admissions and declined to adopt them: "[T]he Court is not satisfied that counsel has adequately investigated the merits of this suit.... [F]ew specifics regarding counsel's factual findings and the analysis of [their] independent consultant were presented to the Court other than the ultimate conclusion that the offer price was not unfair." *Polar,* 187 F.R.D. at 118. While my statements were, to some degree, an authorization for further investigation of the merits by plaintiffs' counsel, they in no way protect plaintiffs' counsel from the consequences of repudiating their previous representations to this Court. Plaintiffs' counsel was irresponsible—or untruthful—in March 1999, or they are irresponsible—or untruthful—now. Either way, the behavior of plaintiffs' counsel is likely sanctionable as will be addressed *infra* Part V.

violated § 14(e) of the Exchange Act, and Rule 14a–9 promulgated thereunder, by making material misrepresentations and omissions in the Tender Offer Statement and Solicitation (collectively, the "Offer Documents"). Complaint ¶¶ 78–80.

Claim II alleges that defendants violated § 13(e) of the Exchange Act, and Rule 13e–3 promulgated thereunder, by failing to procure a written fairness opinion from Deutsche Bank or any other financial adviser. *Id.* ¶¶ 81–86.

Claim III alleges that defendants breached their fiduciary duties to Willis Corroon shareholders by failing to shop the company or to otherwise obtain a higher price for Willis Corroon shares. *Id.* ¶¶ 87–94. Claim IV similarly alleges that defendants' failure to seek superior tender offers for Willis Corroon securities violated BCL § 717 which requires corporate directors to perform their duties in good faith. *Id.* ¶¶ 95–103. Claim V charges defendants with common law fraud and deceit, again alleging that defendants made actionable misrepresentations and omissions in connection with the Offer. *Id.* ¶¶ 104–08.

Pursuant to these claims, plaintiffs seek an order (i) "vitiating and setting aside the positive vote accepting the Tender Offer"; and (ii) "restoring plaintiffs and [the purported class members] to their equity interests in Willis Corroon." *Id.* ¶¶ 108(C)-(D). Plaintiffs also seek compensatory damages and attorneys' fees. *Id.* ¶¶ 108(E)-(F).

## III. Discussion

In their motions to dismiss, defendants attack both the legal sufficiency of plaintiffs' claims and the particularity with which those claims are pleaded. Defendants' arguments are addressed in turn below.

**19.** Section 14(e) was originally added to the Exchange Act as part of the Williams Act. Accordingly, the statute is often referred to as

## A. Claim I: Section 14(e)

Section 14(e) of the Exchange Act [19] "is a broad antifraud provision aimed specifically at tender offers for securities." *Skydell v. Ares–Serono S.A.*, 892 F.Supp. 498, 500 (S.D.N.Y.1995). The statute is largely modeled after section 10(b) of the Exchange Act but is "more explicitly addressed to the tender offer context." *Schreiber v. Burlington N., Inc.*, 472 U.S. 1, 10–11, 105 S.Ct. 2458, 86 L.Ed.2d 1 (1985). Section 14(e) provides, in pertinent part, as follows:

> It shall be unlawful for any person to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in light of the circumstances under which they are made, not misleading, or to engage in any fraudulent, deceptive, or manipulative acts or practices, in connection with any tender offer or request or invitation for tenders, or any solicitation of security holders in opposition to or in favor of any such offer, request, or invitation.

15 U.S.C. § 78n(e).

■ The purpose of the statute is to "get needed information to the investor" so that "public shareholders who are confronted by a cash tender offer for their stock will not be required to respond without adequate information regarding the qualifications and intentions of the offering party." *Buffalo Forge Co. v. Ogden Corp.*, 717 F.2d 757, 760 (2d Cir.1983) (internal quotations omitted), *cited with approval in Schreiber*, 472 U.S. at 5 n. 3, 105 S.Ct. 2458. Accordingly, the most essential element of a § 14(e) claim is "misrepresentation, i.e., the omission or misstatement of material facts." *Id. See also Skydell*, 892 F.Supp. at 501 ("[F]or an act to be 'manipulative,' and therefore violative of § 14(e), there must be either misrepresentation or

" § 14(e) of the Williams Act". Section 13(e), discussed *infra* Part III.B., was similarly added under the Williams Act.

nondisclosure of a material fact or facts.").[20]

In the tender offer context, "[a] misstatement or omission is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding whether to accept the tender offer." *In re PHLCORP Secs. Tender Offer Litig.*, 700 F.Supp. 1265, 1268 (S.D.N.Y.1988) (internal quotations omitted). *See also TSC Indus., Inc. v. Northway Inc.*, 426 U.S. 438, 439, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976) ("An omitted fact is material if there is a likelihood that a reasonable shareholder would consider it important in deciding how to vote."); *Press*, 166 F.3d at 538 (material information in proxy context is "information that would have 'assumed actual significance in the deliberations of the reasonable shareholder'"). In determining whether information is material, "[t]he total mix of information available and the relevant circumstances must be considered." *Press*, 166 F.3d at 538.

■ Materiality is a "mixed question of law and fact that generally should be presented to a jury." *Id.* However, a court may dismiss a claim for failing to adequately plead materiality where no reasonable juror could determine that the alleged misrepresentations or omissions would have assumed actual significance in the decisionmaking of a tendering shareholder. *See id.; see also DeBartolo Group, L.P. v. Richard E. Jacobs Group, Inc.*, 186 F.3d 157, 172 (2d Cir.1999).

In the instant case, plaintiffs allege three material misrepresentations and omissions: (i) defendants portrayed Willis Corroon as weak and noncompetitive with poor future prospects while concealing the company's healthy financial condition and positive internal projections; (ii) defendants failed to disclose a prior business relationship between KKR and Deutsche Bank; and (iii) defendants failed to disclose that Marsh & McLennan Companies Inc. ("Marsh & McLennan") acquired Sedgwick, a competitor of Willis Corroon, for a premium of 58% per share.

### 1. Group Pleading

Before turning to the substance of the alleged misrepresentations and omissions, I first address whether plaintiffs' use of "group pleading" satisfies the particularity requirements of Rule 9(b) with respect to the Insurance Company Defendants. I conclude that it does not.

■ As set forth *supra* Part I, Rule 9(b) requires that in all charges of fraud, the circumstances constituting such fraud must be stated with particularity. To meet this standard, a complaint alleging fraud must (i) specify the statements it claims were false or misleading; (ii) give particulars as to the respect in which plaintiffs contend the statements were fraudulent; (iii) state where and when the statements were made; and (iv) identify those responsible for the statements. *See Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 51 (2d Cir.1995); *In re Health Management, Inc. Secs. Litig.*, 970 F.Supp. 192, 208 (E.D.N.Y.1997). In their motion to dismiss, the Insurance Company Defendants contend, among other things, that plaintiffs have failed to satisfy requirement number four—identification of those responsible for the alleged misstatements. *See* ICD Mem. at 3, 7–8. Those defendants argue that

---

**20.** Plaintiffs must also demonstrate that defendants acted with the requisite scienter. *See Chris–Craft Indus., Inc. v. Piper Aircraft Corp.*, 480 F.2d 341, 363–64 (2d Cir.1973); *Skydell*, 892 F.Supp. at 501. To adequately allege scienter under the heightened pleading requirements of the PSLRA, a complaint must state with particularity facts giving rise to "a strong inference" that the defendants acted with fraudulent intent. *See* 15 U.S.C. § 78u–4(b)(2); *Press*, 166 F.3d at 537–38. A "strong inference" of fraudulent intent may be established by alleging (i) facts that demonstrate defendants' motive and opportunity to commit fraud; or (ii) facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness. *See Press*, 166 F.3d at 538.

except for the caption and a brief characterization of each Insurance Company Defendant as an "investor and partner in Trinity" in the section identifying the parties to the action, they are nowhere referred to by name in the Complaint. Instead, plaintiffs repeatedly refer to "defendants" through their forty-three page litany of wrongdoing without specifying a single act of alleged wrongdoing by any Insurance Company Defendant.

*Id.* at 3.

It is well-settled that "[w]here multiple defendants are asked to respond to allegations of fraud, the complaint should inform each defendant of the nature of [its] alleged participation in the fraud." *DiVittorio v. Equidyne Extractive Indus., Inc.,* 822 F.2d 1242, 1247 (2d Cir.1987). The requirements of Rule 9(b) are "not satisfied by a complaint in which defendants are clumped together in vague allegations." *Ellison v. American Image Motor Co.,* 36 F.Supp.2d 628, 640 (S.D.N.Y.1999) (internal quotations omitted); *see also Pallickal v. Technology Int'l Ltd.,* 94 Civ. 5738, 1996 WL 153699, at *1 (S.D.N.Y. Apr. 3, 1996) ("Where there are multiple defendants, a complaint must identify which defendant is responsible for which act."). After reviewing the Complaint, I find there is no question that plaintiffs have failed to identify "which defendant is responsible for which act." *Pallickal,* 1996 WL 153699, at *1. The Complaint does not differentiate in any way between defendants, nor does it attempt to link any of the defendants with the alleged fraudulent statements. Rather, as the Insurance Company Defendants claim, "defendants are clumped together" as a single entity. *Ellison,* 36 F.Supp.2d at 640; ICD Mem. at 7. Plaintiffs do not dispute their failure to "describe[ ] the specific acts that each of the defendants undertook." Plaintiff[s'] Memorandum of Law in Opposition to Defendants' Motions to Dismiss Plaintiffs' First Amended Complaint ("Pl.Mem.") at 23. Instead, they argue that their collective treatment of defendants is proper under the "group pleading" doctrine. *See id.*

■ The group pleading doctrine is an exception to the requirement that the fraudulent acts of each defendant be identified separately in the complaint. Group pleading allows plaintiffs to "rely on a presumption that statements in prospectuses, registration statements, annual reports, press releases, or other group-published information, are the collective work of those individuals with direct involvement in the everyday business of the company." *In re Oxford Health Plans, Inc.,* 187 F.R.D. 133, 142 (S.D.N.Y.1999) (internal quotations omitted); *see also In re Livent, Inc. Secs. Litig.,* 78 F.Supp.2d 194, 219 (S.D.N.Y.1999) (group pleading doctrine permits plaintiffs "to allege that misstatements contained in company documents may be presumed to be the work of the company's officers and directors"). Accordingly, "no specific connection between fraudulent representations in [a published company document] is necessary where ... defendants are insiders or affiliates" of the company. *DiVittorio,* 822 F.2d at 1247 (internal quotations omitted).

It must be noted, however, that the group pleading doctrine is extremely limited in scope. Courts in the Second Circuit and elsewhere have construed the doctrine as applying only to clearly cognizable corporate insiders with active daily roles in the relevant companies or transactions. *See, e.g., Ouaknine v. MacFarlane,* 897 F.2d 75, 80 (2d Cir.1990) (group pleading inapplicable to defendant who was merely affiliate of company that issued allegedly false offering memorandum); *DiVittorio,* 822 F.2d at 1249 (group pleading doctrine inapplicable to affiliates of corporate defendants where those affiliates were not "tied to the [allegedly fraudulent] Offering Memorandum in any specific way, or even alleged to have been an officer or director of [the corporate defendants] when the Offering Memorandum was issued"); *Powers v. Eichen,* 977 F.Supp. 1031, 1041 (S.D.Cal.1997) (group pleading doctrine in-

applicable to outside directors where "allegations do not sufficiently describe the outside directors' day-to-day involvement in the corporation but rather attempt to include these directors by virtue of their titles and boilerplate 'access to information' language").

■ With respect to Trinity, KKR, the Individual Defendants and the Investment Bank Defendants, such group pleading tactics are appropriate. As demonstrated by the Offer Documents themselves, all of these defendants were intimately involved both in negotiating the Offer and in drafting the allegedly fraudulent Solicitation and Tender Offer Statement. For example, the Solicitation—which was issued on behalf of Trinity, Willis Corroon and KKR—includes letters to Willis Corroon shareholders from five of the Individual Defendants and all of the Investment Bank Defendants. *See* Solicitation, Ex. A to Curnin Aff., at 4–5 (letter from Individual Defendant Reeve to shareholders); 6–10 (letter from Individual Defendants Rendle, Rodgers, Skyes and Viault to shareholders); 11–22 (letter from Investment Bank Defendants to shareholders). Accordingly, plaintiffs may properly rely on group pleading with respect to these defendants.[21]

■ With respect to the Insurance Company Defendants, however, plaintiffs' use of group pleading is defective as a matter of law. Based on the allegations in the Complaint, it is impossible to characterize the Insurance Company Defendants as corporate insiders with direct involvement in the daily activities of the relevant companies or intimate knowledge of the challenged transaction. The Complaint asserts only that the Insurance Company Defendants are "investor(s) and partner(s) in Trinity"; it fails to otherwise connect the Insurance Company Directors to the Offer or the Offer Documents. Complaint ¶¶ 8–20. Similarly, there is nothing in the Offer Documents themselves that would tie the Insurance Company Defendants to the representations therein. The Insurance Company Defendants' status as institutional investors in Trinity is insufficient to render them corporate insiders such that the group pleading doctrine applies. Plaintiffs' § 14(e) claim against the Insurance Company Defendants is therefore dismissed as a matter of law pursuant to Rule 9(b).

I now turn to a discussion of the alleged misstatements and omissions involving (i) Willis Corroon's financial condition; (ii) the relationship between KKR and Deutsche Bank; and (iii) the acquisition of Sedgwick for a 58% premium.

### 2. Willis Corroon's Financial Condition

Plaintiffs contend that defendants[22] purposefully misrepresented the financial condition of Willis Corroon by depicting the firm as a "weak noncompetitive company with poor short to medium term prospects" when, in fact, "Willis Corroon was . . . a successful, profitable and competitive company." Complaint ¶ 47. Specifically, plaintiffs allege that the Offer Documents "misstated the posture of [Willis Corroon] and its financial and operational outlook, concealed its positive aspects, and falsely stated how the Offer purportedly would benefit [Willis Corroon]." *Id.* ¶ 44. Plaintiffs also claim that defendants failed to disclose positive internal projections and manipulated Willis Corroon's financial statements for the first nine months of

---

21. Indeed, other than a brief, one-sentence footnote, these defendants do not seriously dispute that, at this preliminary stage, plaintiffs may hold them collectively responsible for statements and omissions in the Offer Documents. *See* Memorandum of Law in Support of Defendants' Motion to Dismiss Plaintiffs' First Amended Class Action Complaint ("Defs.Mem.") at 7 n. 3.

22. Although the preceding section dismisses plaintiffs' § 14(e) claim against the Insurance Company Defendants, *see supra* Part III.A.1., those defendants are included here because plaintiffs' failure to adequately allege misrepresentations and omissions provides an alternative ground for dismissal.

1998. *Id.* ¶¶ 56–60. According to plaintiffs, this combination of financial misrepresentations and omissions was a "scare tactic[ ]" designed to eliminate Willis Corroon shareholders at a below-market price. *Id.* ¶¶ 5, 66. For the following reasons, plaintiffs' various allegations of financial misstatement are legally insufficient.

### a. Information Regarding Willis Corroon's Financial Condition was Publicly Disclosed Prior to the Offer

█ Although plaintiffs claim that defendants failed to disclose Willis Corroon's true financial condition, *id.* ¶¶ 48–54, the documents upon which plaintiffs rely in support of their argument were publicly disseminated prior to the Offer. For example, plaintiffs assert that Willis Corroon was a competitive company with a positive future based on the following statements set forth in Willis Corroon's 1997 Annual Report to Shareholders ("1997 Annual Report"):

"Our 1997 results show a robust performance in the face of an extremely difficult rating environment and significantly adverse rate movements."

"[In 1997, Willis Corroon's] UK retail business achieved substantial growth in profitability."

"[In 1997, Willis Corroon's] balance sheet remains strong, aided by substantially enhanced cash generation."

"During 1998, we will continue to pursue initiatives designed both to ensure that we achieve global best practice standards in our insurance and reinsurance

transnational activities and to realize our vision of becoming a more broadly based professional services firm.... *We believe that these endeavors will deliver enhanced value to our shareholders.*"

Complaint ¶¶ 54(i)-(iv) (quoting 1997 Annual Report) (emphasis in original). Plaintiffs similarly rely on statements set forth in Willis Corroon's Form 6–K for the month of June 1998; Willis Corroon's First Quarter Report for the Quarter ending March 31, 1998; Willis Corroon's Form 20–F for fiscal year 1997; and a Willis Corroon press release dated April 27, 1998. *See id.* ¶¶ 48–55. However, each of these documents was publicly disclosed prior to the Offer, *see id.*, so there can be no argument that defendants concealed this information from shareholders.[23] *See Brickman v. Tyco Toys Inc.,* 731 F.Supp. 101, 104 (S.D.N.Y.1990) ("[I]f the court finds that the information was in fact disclosed, under the facts alleged in the complaint, then of course plaintiff has failed to state a cause of action."); *Rodman v. Grant Found.,* 460 F.Supp. 1028, 1035 (S.D.N.Y.1978) (" '[T]here is no duty to disclose information to one who reasonably should already be aware of it.' "), *aff'd,* 608 F.2d 64 (2d Cir.1979). As defendants assert, "[t]o the extent plaintiffs' allegation [of financial omission] is based on these documents, it is plainly frivolous." Defs. Mem. at 8.[24]

### b. Statements in Offer Documents Were Neither False Nor Misleading

█ Plaintiffs also fail to demonstrate that statements included in the Offer Doc-

---

23. Plaintiffs cite a single document that was not publicly released prior to the Offer—a July 19, 1999 *Business Insurance* magazine article that was published one year after the Offer commenced and almost seven months after the Trinity acquisition was completed.

24. The illogic of plaintiffs' claims regarding defendants' alleged failure to disclose Willis Corroon's financial condition is well-illustrated in plaintiffs' opposition papers. Plaintiffs argue, for example, that statements in the Offer Documents were "belied by Defendants' *previous public statements* that the company

had a bright future." Pl. Mem. at 18 (emphasis added). Plaintiffs similarly argue that the "doom and gloom" statements in the Offer Documents were false in light of *"the previously available information* showing the company in a positive light." *Id.* at 19 (emphasis added). Not only are these assertions conclusive evidence that Willis Corroon's financial condition was in the public domain at the time of the Offer, but they undermine plaintiffs' allegations that shareholders were misled by purportedly negative forecasts in the Offer Documents.

uments were false or misleading to shareholders. The Complaint identifies the four statements below—set forth in the Offer Documents—as fraudulent.

(1) "[The Trinity acquisition] would eliminate 'persistent speculation over Willis Corroon's ownership, which has distracted staff, held the Willis Corroon Group back in attracting new talent, and limited the Willis Corroon Group's ability to win new business.'" Complaint ¶ 44(a) (quoting Solicitation, Ex. A to Curnin Aff., at 4).[25]

(2) "'As a private company, the Willis Corroon Group will be seen as a more stable independent broker, able to implement the changes necessary for the longer-term, without distracting its staff from their primary objectives of delivering solutions to clients' needs and competing effectively in the market place.'" *Id.* ¶ 44(b) (quoting Solicitation, Ex. A to Curnin Aff., at 4).

(3) "'[In evaluating the Offer, the independent directors considered, among other things] the competitive nature of the insurance br[o]king market, the extent of the restructuring and change which the Willis Corroon Group would have to undertake in order to develop within this environment and the implications for Wills Corroon's share price if Willis Corroon were to remain as an independent listed public company.'" *Id.* ¶ 44(c) (quoting Solicitation, Ex. A to Curnin Aff., at 8).

(4) "'[In evaluating, the Offer, the independent directors also considered the benefits of removing] uncertainty surrounding the future ownership of

Willis Corroon for employees, clients and insurance markets.'" *Id.* ¶ 45(a) (quoting Solicitation, Ex. A to Curnin Aff., at 8).

None of these statements constitutes an actionable misrepresentation.

*First,* although plaintiffs allege in conclusory fashion that these statements are "materially false and misleading", they fail to explain why or how. For example, with respect to the first statement listed above, plaintiffs do not dispute that persistent speculation existed with respect to Willis Corroon's ownership. In fact, plaintiffs themselves assert that "since 1996, Marsh & McLennan and Aon Corporation (another international insurance brokerage) have acquired six of the top 20 brokers in the world." *Id.* ¶ 68. In such a rapidly consolidating industry, takeover rumors and rampant speculation as to the future of the remaining players are inevitable. Likewise, it is not surprising that such speculation distracted Willis Corroon staff and limited the firm's ability to attract new clients and qualified employees. Significantly, plaintiffs do not allege otherwise.

In addition, plaintiffs never dispute that (i) as a private company, Willis Corroon would be perceived as more stable and competitive; (ii) an acquisition by Trinity would remove uncertainty surrounding the future ownership of the firm; (iii) the insurance broking market is highly competitive; and (iv) if Willis Corroon were to remain successful in that market as an independent listed company, some amount of restructuring and change would likely be needed. Stated succinctly, plaintiffs provide no basis upon which a reasonable juror could find that any of the four challenged statements are false or misleading.

---

**25.** Plaintiffs have, to some degree, taken this quote out of context. The full statement set forth in the Solicitation reads as follows:

Over recent years, the world's insurance markets have become increasingly competitive.... This environment has led to a process of industry consolidation and a consequent reduction in the number of

competing independent insurance brokers, particularly amongst the larger participants. This industry consolidation has created persistent speculation over Wills Corroon's ownership, which has distracted staff, held us back in attracting new talent and limited our ability to win new business. Solicitation, Ex. A to Curnin Aff., at 4.

Moreover, plaintiffs violate Rule 9(b) which requires that a complaint alleging fraud set forth with particularity the respect in which the challenged statements were fraudulent. *See Acito,* 47 F.3d at 51; *In re Health Management,* 970 F.Supp. at 208.

*Second,* plaintiffs fail to demonstrate that the four challenged statements are inconsistent with the previously disclosed financial condition of Willis Corroon. In dramatic fashion, plaintiffs repeatedly characterize the statements listed above as "doom and gloom warnings" meant to "frighten" and "scare" shareholders with respect to Willis Corroon's future viability. *See* Complaint ¶¶ 46–47, 66, 76.

At the motion to dismiss stage, a court must accept as true the well-pleaded allegations of the Complaint. However, the court need not adopt plaintiffs' subjective characterizations of documents properly before it. *See Madonna v. United States,* 878 F.2d 62, 65 (2d Cir.1989) (declining to accept, on Rule 12(c) motion, plaintiff's subjective characterizations of fraud where those characterizations were unsupported by plain language of relevant documents); *Hoffman v. Empire Blue Cross & Blue Shield,* 96 Civ. 5448, 1999 WL 782518,*2 (S.D.N.Y. Sep. 30, 1999) (stating that, on Rule 12(b)(6) motion, court need not accept "plaintiff's legal conclusions and characterizations" as true). Careful consideration

of the four challenged statements reveals that plaintiffs' description of those statements distort their plain meaning.

Based on the language of the statements themselves, no reasonable investor could conclude that defendants "paint[ed] the picture of an unstable, struggling company that is incapable of increasing shareholder value." Pl. Mem. at 19. Those statements merely describe the benefits—benefits that plaintiffs do not dispute—of accepting the Offer, and the various serious risks—risks that plaintiffs do not dispute—to Willis Corroon and its shareholders of continuing as an independent public company.[26]

More important, however, these isolated statements must be read within the context of "the total mix of information available." *See Press,* 166 F.3d at 538; *see also In re PHLCORP,* 700 F.Supp. at 1269 ("The Court of Appeals has held that the presence of arguably misleading statements in a tender offer are not material where the statement also contains 'clear representations' of the pertinent facts."). Plaintiffs have entirely ignored those portions of the Solicitation that report the positive performance of Willis Corroon during 1997 and the beginning of 1998—precisely the information plaintiffs claim was "concealed" from shareholders in the Offer Documents. Among other things, the Solicitation includes Willis Corroon's audited financial statements for the three

---

**26.** I note one particularly egregious example of plaintiffs' attempt to allege fraud through hyperbole. In their opposition to defendants' motions, plaintiffs advance the following argument:

> The Tender Offer warns ... of the "implications for Willis Corroon's share price if Willis Corroon were to remain as an independent listed public company." This statement *all but threatens that prices will plummet* without the Agreement. This *dire forecast* hardly matches the reality of the Company's financial condition, which was *excellent* during the time leading up to the Offering.

Pl. Mem. at 19 (emphasis added). Again, no reasonable investor could conclude that the referenced statement constitutes a "dire forecast" threatening that Willis Corroon stock "will plummet" absent the Trinity transaction. In fact, read properly in context, the statement merely informs shareholders that, "[i]n considering the Offer, the Independent Directors .... have taken account of", among other things, "the implications for Willis Corroon's share price" were the firm to remain a public company. Solicitation, Ex. A to Curnin Aff., at 8.

Similarly, no reasonable investor could read the 1997 Annual Report as an unqualified statement that Willis Corroon's condition was "excellent." Even the small portion of the 1997 Annual Report quoted by plaintiffs in their Complaint clearly references the insurance industry's "extremely difficult rating environment and significantly adverse rate movements." Complaint ¶ 54(i) (quoting 1997 Annual Report).

years ending December 31, 1997, as well as the firm's interim unaudited financial statements for the six months ending June 30, 1998. *See* Solicitation, Ex. A to Curnin Aff., at 52–78. The Solicitation also sets forth the text of a Willis Corroon press release announcing the 1998 interim results. *Id.* at 72. As the following excerpt demonstrates, the 1998 press release comments favorably on Willis Corroon's performance, effectively tracking the language of the 1997 Annual Report:

> [Willis Corroon's] brokerage and fee revenue rose by 4% in underlying terms, a significant improvement over the trend in the first quarter.
>
> . . . .
>
> John Reeve, Executive Chairman, comments: "The exceptional charges, while not a surprise, mask an improving underlying performance in a difficult trading environment. The underlying trend of revenue growth is better than that reported for the first quarter, which was affected by short-term timing differences, especially in our global specialty business. The improvement in the rate of revenue growth of our North American retail operations . . . is evidence of the success of the initiatives we have taken to enhance the business generation of those operations."

*Id.* Similarly, in his July 27, 1998 Letter to Shareholders, which appears on page four of the Solicitation, Individual Defendant Reeve states:

> Your board has consistently maintained its commitment to the delivery of shareholder value. To this end, it has in recent years pursued a programme of change to improve [Willis Corroon's] competitiveness, with particular attention to costs and efficiencies. While real progress has been made, it has been difficult to achieve significant improvements in profitability in such market conditions.
>
> For [Willis Corroon] to grow and prosper within our industry, it will be necessary to continue the pursuit of change and efficiency. . . .
>
> . . . .
>
> [Willis Corroon] also announced on 22 July 1998 its unaudited results for the six months ended 30 June 1998. . . . I would like to thank all of our employees for their efforts and commitment in achieving these results against a competitive background.

*Id.* at 4–5. Reeve's statements again mirror those set forth in the 1997 Annual Report. Reeve talks about the historical success of Willis Corroon, and thanks Willis Corroon employees for the firm's positive 1998 interim results. The fact that he also expresses grave concerns about Willis Corroon's ability to maintain these achievements in future years is neither inconsistent with the prior statements nor false in light of the absolute dearth of contrary allegations by plaintiffs.

### c. Concealment of Internal Projections and Manipulation of Financial Statements

■ Plaintiffs allege that defendants concealed positive "internal projections" regarding the financial health of Willis Corroon. However, nowhere do plaintiffs set forth a single fact in support of this assertion. Plaintiffs fail to identify in any way the internal projections to which they refer; among other things, the Complaint does not describe the substance of those projections, nor does it state who created those projections. Indeed, the entirety of plaintiffs' claim regarding the internal projections is as follows:

> Defendants knew, but failed to disclose to plaintiffs and the Class[,] that based upon the Company's internal projections, operating results and trends, Willis Corroon would actually improve its sales and profitability in 1998 and thereafter.
>
> The information concerning Willis Corroon's revenue and profitability trends was concealed from holders of Willis Corroon ADRs in the Tender Of-

fer by defendants even though such information would have been critical in making an informed decision regarding the Tender Offer.

Complaint ¶¶ 56–57. Such vague and bare references to "internal projections" and inside "information" fail to satisfy any pleading standard, let alone the heightened standard set forth in Rule 9(b). *See San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801, 812 (2d Cir.1996) ("Plaintiffs' unsupported general claim of the existence of confidential company sales reports that revealed the larger decline in sales is insufficient to survive a motion to dismiss."); *Rothenberg v. Perelman*, 89 Civ. 4308, 1990 WL 3244, at *1 (S.D.N.Y. Jan. 9, 1990) (plaintiff's failure to provide "specific description of the alleged 'inside information' or when it was obtained ... is 'grounds in itself for dismissing [a] cause of action under Fed.R.Civ.P. 9(b)' ").

▮ Plaintiffs' equally bare allegation that defendants manipulated Willis Corroon's 1998 financial statements in an effort to make the firm appear unprofitable during the months prior to the Office is both baseless and implausible as a matter of law.

Plaintiffs contend that defendants "manipulated and controlled the booking of sales and income for the first nine months of 1998" in order to give Willis Corroon "the appearance of a struggling company." Complaint ¶¶ 59–60. However, even a cursory review of the interim financial results for the first two quarters of 1998—the most current financial data included in the Offer Documents—demonstrates that Willis Corroon was far from "struggling". *See* Solicitation, Ex. A to Curnin Aff., at 72–78. Those interim results demonstrate that during the first six months of 1998,

Willis Corroon's profit before exceptional charges and tax was 4% higher than during the same period in 1997. *See id.* at 72–73. The interim results similarly show that the firm's operating revenue during the first six months of 1998 was £359.1 million, up 4% from the firm's operating revenue of £356.9 million during the same period in 1997. *See id.* Thus, there is absolutely no factual support for plaintiffs' conclusory assertion that an "evaluation of the Company's revenues and profits clearly indicates that defendants manipulated Willis Corroon's financial data." Complaint ¶ 60.

In an even more misguided attempt to allege financial manipulation, plaintiffs claim that defendants reported artificially poor results for the third quarter of 1998 (July 1, 1998 to September 30, 1998) in order to trick shareholders into believing that the Trinity Offer was fair and reasonable. *Id.* ¶¶ 59–60, 66. According to plaintiffs, Willis Corroon's "operating revenue dropped from $166.6 [million] in the second quarter of 1998 to $109.7 million in the third quarter—only to rebound to $249.2 million in the fourth quarter." *Id.* ¶ 59. Plaintiffs' theory is nonsensical because Willis Corroon's financial results for the third quarter of 1998 were necessarily reported sometime after September 30 of that year. However, as plaintiffs themselves admit, more than 90% of Willis Corroon shareholders had tendered their shares by September 25, 1998. *Id.* ¶ 70.[27] Accordingly, even assuming defendants manipulated Willis Corroon's third quarter 1998 results, those misrepresentations could not have misled Willis Corroon shareholders who tendered their shares without ever reviewing the allegedly fraudulent data.[28] Of course, the fact that Willis Corroon's third quarter 1998 results were

---

**27.** In fact, according to defendants, more than 93% of Willis Corroon shareholders tendered their stock by September 7, 1998. *See supra* note 14; Curnin Aff. ¶¶ 6–7.

**28.** As explained *supra* Part II.A.2., once 90% of Willis Corroon shareholders tendered their

ownership interests, defendants were able to acquire the remaining shares through compulsory acquisition. Therefore, it is immaterial whether the remaining Willis Corroon shareholders reviewed the allegedly fraudulent third quarter 1998 results.

not released until after the conclusion of the Offer undermines any claim by plaintiffs that defendants purposefully manipulated those results in order to induce Willis Corroon shareholders to tender their stock.

Finally, to the extent plaintiffs attempt to assert manipulation of Willis Corroon's 1998 financial results based upon nothing more than Willis Corroon's more positive fourth quarter 1998 and 1999 financial results, see, e.g., Complaint ¶¶ 58–59, such attempt is tantamount to "allegations of 'fraud by hindsight', which [the Second Circuit] has rejected as a basis for a securities fraud complaint." *Stevelman v. Alias Research Inc.*, 174 F.3d 79, 85 (2d Cir.1999); see also Olkey v. Hyperion 1999 *Term Trust, Inc.*, 98 F.3d 2, 8 (2d Cir. 1996) ("To show misrepresentation, the complaint must offer more than allegations that the portfolios failed to perform as predicted.... 'Fraud by hindsight' alone will not sustain a complaint."). In other words, plaintiffs cannot allege fraud simply because, in hindsight, Willis Corroon performed better than predicted.[29]

### 3. Conflict of Interest

In addition to their unfounded claims of financial misrepresentation, plaintiffs argue that defendants "failed to reveal prior significant business relationships between defendant[ ] KKR and Deutsche Bank that rendered Deutsche Bank's fairness opinion in the Tender Offer suspect." Pl. Mem. at 22; see also Complaint ¶ 77. The Complaint alleges that prior to the commencement of the Offer, KKR sold a company called American Re to Deutsche Bank "at a great profit." Complaint ¶ 39. However, a publicly available proxy statement

filed with the SEC demonstrates that in 1996, a KKR-related entity sold American Re to a company called Munich Re, not to Deutsche Bank. See 11/21/96 American Re Corporation Proxy Statement, Ex. C to Curnin Aff.[30] Plaintiffs now claim that "Deutsche Bank['s] parent ... was a ten percent owner of Munich Re", and therefore the 1996 transaction involving a KKR-related entity, American Re and Munich Re should have been disclosed to Willis Corroon shareholders in the Offer Documents. See Pl. Mem. at 23 n. 7.

 There is no question that

[p]otential conflicts of interest, such as where a corporate director has a personal stake in a corporate decision or has a special relationship with a party whose interests may be adverse to those of the shareholders, must be disclosed so that shareholders are alerted to the possible impairment of the director's judgment and know to put the director's recommendations in perspective.

*Kahn v. Wien*, 842 F.Supp. 667, 677–78 (E.D.N.Y.), aff'd, 41 F.3d 1501 (2d Cir. 1994). See also Wilson v. Great Am. Indus., Inc., 855 F.2d 987, 993–94 (2d Cir. 1988) (finding material omission where proxy statement failed to disclose several significant and longstanding relationships between the directors of two merging companies); *Kas v. Financial Gen. Bankshares, Inc.*, 796 F.2d 508, 513–15 (D.C.Cir.1986) (finding defendants' failure to disclose in proxy statement that two directors of target company were also directors of acquiring company a material omission). Whether a potential conflict must be disclosed is governed by the general materiality standard set forth above,

---

**29.** Of course, in the instant case, improved revenue and profits in the fourth quarter of 1998 and all of 1999 would only serve to demonstrate that Willis Corroon performed exactly as predicted; namely, it became more profitable following acceptance of the Offer for all the reasons set forth by defendants in the Offer Documents.

**30.** As early as October 1998, defendants informed plaintiffs and the Court that American Re was sold to Munich Re, not to Deutsche Bank. See Polar, 187 F.R.D. at 115 n. 5. Thus, plaintiffs' continued reference to "a transaction whereby KKR sold their American reinsurance subsidiary, American Re, to Deutsche Bank London at a great profit", see Complaint ¶ 39, is disturbing.

namely would the undisclosed potential conflict "have assumed actual significance in the deliberations of a reasonable shareholder." *Kas,* 796 F.2d at 515.

██ The undisclosed potential conflict alleged here does not involve a director's "personal stake in a corporate decision" or a director's "special relationship with a party whose interests may be adverse to those of the shareholders."[31] Rather, it concerns a nonparty's peripheral involvement in a publicly disclosed transaction which was completed almost two years before the Offer commenced. Accordingly, it is frivolous to suggest that there is a "substantial likelihood" that reasonable Willis Corroon shareholders would have considered a KKR-related entity's 1996 sale of American Re to Munich Re—a company in which Deutsche Bank's parent had a 10% interest—"important in deciding whether to accept" the Offer. In fact, to include such attenuated information in a proxy statement contravenes the express purpose of the federal securities laws which "require that disclosure[s] [to shareholders] steer a middle course, neither submerging a material fact in a flood of collateral data, nor slighting its importance through seemingly cavalier treatment." *I. Meyer Pincus & Assocs., P.C. v. Oppenheimer & Co.,* 936 F.2d 759, 762 (2d Cir. 1991) (internal quotations omitted).

### 4. Sedgwick Acquisition

██ The Complaint alleges that Marsh & McLennan's August 1998 acquisition of the Sedgwick Group at a 58% premium demonstrates that Trinity's July 1998 acquisition of Willis Corroon at a 12% premium was inadequate. Complaint ¶¶ 2, 67. Regardless of the merits of plaintiffs' allegation concerning the Offer price, that allegation cannot support a claim for federal securities fraud, because the substantive

fairness of the terms of a tender offer is irrelevant under § 14(e). *See Data Probe Acquisition Corp. v. Datatab, Inc.,* 722 F.2d 1, 4 (2d Cir.1983) (holding that § 14(e) does not authorize "federal courts to review the substantive validity of corporate actions undertaken during the course of a tender offer"); *Skydell,* 892 F.Supp. at 501 ("[T]he court should refrain from considering the substantive fairness of any particular tender offer."); *Diamond v. Arend,* 649 F.Supp. 408, 416–17 (S.D.N.Y. 1986) ("The Second Circuit has repeatedly emphasized that [§ 14(e) of] the Williams Act is concerned with the procedural safeguards available to shareholders, not 'with the substantive terms of takeover bids.' ").

██ Perhaps realizing that issues regarding the substantive fairness of tender offers are matters of state law rather than federal law, plaintiffs contend for the first time in their opposition papers that "[a] truly disinterested fairness opinion ... should have been updated and circulated to shareholders to reflect the material August 1998 acquisition by Marsh & McLennan Companies Inc. of London-based insurance company Sedgwick Group plc." Pl. Mem. at 2. Even assuming plaintiffs had properly pleaded this allegation in their Complaint, defendants' failure to inform shareholders of a publicly disclosed acquisition that occurred after the commencement of the Offer cannot state a claim for fraud. Plaintiffs cite no authority—nor is the Court aware of any authority—which would require defendants to amend the Offer Documents and recirculate those documents to shareholders in order to disclose the unrelated Sedgwick acquisition which was widely reported in the media. *See, e.g.,* Joseph B. Treaster, *Marsh & McLennan to Buy Big British Insurance Broker,* N.Y. Times, Aug. 26, 1998, § D at 2.[32] *See also Brickman,* 731

---

**31.** Indeed, the Offer Documents disclose in great detail the "personal stake" of certain Willis Corroon directors in the Offer. *See, e.g.,* Solicitation, Ex. A to Curnin Aff.

**32.** The Treaster article is attached as Exhibit C to the 2/19/99 Affidavit of Kevin O'Shea, which is in turn attached as Exhibit K to the Sporn Affidavit. As discussed *supra* note 18, the Sporn Affidavit was submitted by plain-

F.Supp. at 104 (no duty to disclose information already in the public domain); *Rodman,* 460 F.Supp. at 1035 (same).[33]

\* \* \* \* \* \*

For the multitude of reasons set forth above, plaintiffs' have failed to adequately allege the threshold element of a § 14(e) claim—material misrepresentations or omissions. Accordingly, plaintiffs § 14(e) claim is dismissed with respect to all defendants pursuant to Rules 12(b)(6) and 9(b).[34]

## B. Claim II: Section 13(e)

Section 13(e) of the Exchange Act, and Rule 13e–3 promulgated thereunder, regulate "going private" transactions in which an issuer of securities, or its affiliate, seeks to purchase the issuer's outstanding equity. *See* 15 U.S.C. § 78m(e); 17 C.F.R. § 240.13e–3. Section 13(e) requires that issuers or affiliates engaged in such transactions provide shareholders with certain disclosure, while Rule 13e–3 lists the specific information to be disclosed.

Claim II of the Complaint alleges that defendants violated § 13(e) and Rule 13e–3 by failing to provide Willis Corroon share-

holders with all of the information mandated by those provisions. Complaint ¶¶ 81–86. Specifically, plaintiffs contend that defendants improperly failed to procure a written fairness opinion from Deutsche Bank. *Id.* ¶¶ 3, 39, 43. Plaintiffs also contend that defendants failed to provide shareholders with "the information needed to assess the fairness of the [Trinity/Willis Corroon] transaction." Pl. Mem. at 11; Complaint ¶¶ 40–41. In their motions to dismiss, defendants argue that § 13(e) does not govern Trinity's acquisition of Willis Corroon because Trinity is not an "affiliate" of Willis Corroon for purposes of the statute. *See* Defs. Mem. at 13; ICD Mem. at 6.[35]

Rule 13e–3 defines an "affiliate" of an issuer as one "who directly or indirectly through one or more intermediaries controls, is controlled by, or is under common control with such issuer." 17 C.F.R. § 240.13e–3(a)(1). The critical inquiry is whether, at the time of the challenged tender offer, the acquirer had the ability "to direct or cause the direction of the management and policies of [the target

---

tiffs in connection with the parties' proposed class settlement. It is properly considered by this Court on defendants' motion to dismiss because the article was clearly within plaintiffs' possession and knowledge at the time they filed the instant Complaint. *See Brass v. American Film Techs., Inc.,* 987 F.2d 142, 150 (2d Cir.1993) (finding that on motion to dismiss, courts may consider "documents either in plaintiff['s] possession or of which plaintiff[ ] had knowledge and relied on in bringing suit").

**33.** Plaintiffs additionally claim that defendants "gave preferential and unequal treatment to Phillips & Drew" by purchasing Willis Corroon stock from Phillips & Drew prior to the Offer. Complaint ¶¶ 6, 31–32; *see also supra* Part II.A.2. However, plaintiffs do not identify any law or duty violated by this conduct. And, in fact, several courts have held that share purchases by the acquirer made in advance of a tender offer are not improper. *See, e.g., Lerro v. Quaker Oats Co.,* 84 F.3d 239 (7th Cir.1996); *Kahn v. Virginia Retirement Sys.,* 13 F.3d 110, 113 (4th Cir.1993).

**34.** Because plaintiffs' failure to allege a material misstatement is dispositive of their § 14(e) claim, it is unnecessary to address the issue of scienter.

**35.** Defendants also contend that plaintiffs cannot assert a claim under § 13(e) because the statute does not provide for a private right of action. *See* Defs. Mem. at 13–14. Defendants' argument raises an apparently unsettled issue; a review of the relevant caselaw demonstrates that there is a lack of consensus among the courts as to whether § 13(e) authorizes private suits. *Compare Fisher v. Plessey Co. Ltd.,* 82 Civ. 1183, 1983 WL 1328 (S.D.N.Y. June 22, 1983) (private right of action under § 13(e)) *with Berg v. First Am. Bankshares, Inc.,* 83 Civ. 3887, 1985 WL 2232 (D.D.C. Apr.17, 1985) (no private right of action under § 13(e)). However, it is unnecessary to reach that issue here. As explained below, because Trinity is not an affiliate of Willis Corroon, § 13(e) cannot govern its acquisition of Willis Corroon. Accordingly, the statute does not apply, even assuming the existence of a private right of action.

company], whether through the ownership of voting securities, by contract or otherwise." *Radol v. Thomas,* 556 F.Supp. 586, 592 (S.D.Ohio 1983) (internal quotations omitted), *aff'd,* 772 F.2d 244 (6th Cir.1985). To determine whether the requisite control is present, courts have considered a combination of factors, including (i) prior relationships between directors of the target company and the acquirer; (ii) whether any director of the target company received compensation from the acquirer (other than through the sale of his or her shares); (iii) whether the acquirer sought to improperly influence the directors of the target company; and (iv) whether the target directors retained positions with the acquirer following the transaction. *See Schwarzschild v. Tse,* 90 Civ. 20052, 1992 WL 448796, at *7 (N.D.Cal. Dec. 9, 1992).

In the instant case, plaintiffs advance three theories in support of their argument that Trinity was an affiliate of Willis Corroon at the time of the Offer. None is legally sufficient to demonstrate that Trinity controlled Willis Corroon's decision to recommend the Offer to shareholders.[36]

*First,* plaintiffs argue that Trinity controlled Willis Corroon because seven senior executives of Willis Corroon—Individual Defendants Reeve, Colraine, Johnson, Nixon, Pinkston, Schreyer and Lucas—had agreed in principle to invest in Trinity,[37] and "upon completion of the Offer, John Reeve [was to] become a member of the board of Trinity." Pl. Mem. at 10. However, these executives' agreements in principle to invest in Trinity, and Reeve's future position with Trinity, are irrelevant. None of the seven senior executives referred to by plaintiffs voted on whether to recommend the Offer to Willis Corroon shareholders. In fact, as set forth above, it was precisely because of these executives' personal interest in the Offer that a committee of independent directors was selected to evaluate the fairness of the Offer. *See supra* Part II.A.2.; Solicitation, Ex. A to Curnin Aff., at 6. *See also Woodward & Lothrop, Inc. v. Schnabel,* Nos. 84 Civ. 1716, 84 Civ.2051, 84 Civ. 2102, 1984 WL 2464,*6 (D.D.C. Sept. 10, 1984) (refusing to find that acquirer was an affiliate where "there [was] no evidence whatsoever that [the acquirer] was in any position to direct [the target company's] management and policy when the merger agreement was executed").[38]

---

**36.** I note with frustration that, similar to their claims regarding the Sedgwick acquisition, plaintiffs' claims regarding Trinity's status as an affiliate are not pleaded in the Complaint. Instead, the Complaint incorrectly alleges that "[t]he sale of Willis Corroon was a 'going private' transaction *in which the issuer, Willis Corroon, made a tender offer* to the shareholders of the Company." Complaint ¶ 84 (emphasis added). As defendants point out in their motions to dismiss, *see* Defs. Mem. at 13; ICD Mem. at 6, this allegation is clearly flawed because it is undisputed that Trinity, not Willis Corroon, made the challenged offer. *See* Solicitation, Ex. A to Curnin Aff.; Complaint ¶ 2. It is only in response to defendants' motion papers that plaintiffs now allege Trinity is an affiliate of Willis Corroon for purposes of § 13(e). *See* Pl. Mem. at 10. Although the Court will once again treat plaintiffs' allegations as if they were properly set forth in the Complaint, plaintiffs' constant iteration of new theories in response to defendants' reasoned arguments undermines both the validity of plaintiffs' claims and the good faith of plaintiffs and their counsel in asserting those claims.

**37.** Plaintiffs cite the Solicitation for the proposition that "seven Willis Corroon senior executives, including the executive directors, *invested in the Trinity Group for the purpose of making the Offer.*" Pl. Mem. at 10 (emphasis added). However, the plain language of the Solicitation merely states that "[s]even senior executives ... *have agreed in principle to invest* in the Trinity Group...." Solicitation, Ex. A to Curnin Aff., at 6 (emphasis added).

**38.** In a section of the Complaint addressing the substantive fairness of the Trinity Offer, plaintiffs allege that the "'Independent Directors' were not truly independent because they were hand-picked by the Management who stood to receive an equity position in the surviving entity." Complaint ¶ 73. However, this conclusory statement cannot support a claim that the independent directors were somehow under the control or domination of the executive directors. *First,* it is unclear why or how the independent directors would

*Second,* plaintiffs contend that "the Willis Corroon executive management team will continue to run the business." Pl. Mem. at 10. However, plaintiffs again fail to explain how this fact is in any way relevant to the issue of Trinity's ability to direct and control Willis Corroon. As a general matter, members of management rarely exercise any control over the decisions and policies of a corporate board. Plaintiffs do not allege otherwise here. More specifically, there is no allegation or indication that members of management played any part in Willis Corroon's decision to recommend the Offer to its shareholders.[39]

*Third,* plaintiffs assert—without explanation or citation—that "Directors also received compensation from Trinity." Pl. Mem. at 10. Despite plaintiffs' conclusory and bare assertion, there is absolutely no factual basis for the allegation that, apart from monies received for tendering their shares, Willis Corroon directors were compensated by Trinity.

■ It is significant to note that plaintiffs do not allege—presumably because they cannot—that Willis Corroon or any of its directors had prior relationships with Trinity or KKR. In addition, plaintiffs fail to cite any cases in which courts have found an affiliate relationship for purposes of § 13(e) under the circumstances presented here. Indeed, plaintiffs cite only two cases in support of their claim that Trinity controlled Willis Corroon: *Schwarzschild* and *Woodward.* In both, the courts determined that the acquirer was not an affiliate of the issuer for purposes of § 13(e). *See Schwarzschild,* 1992 WL 448796, at *7; *Woodward,* 1984 WL 2464, at *6. Because plaintiffs have failed to allege any facts which would allow a reasonable juror to determine that Trinity controlled Willis Corroon at the time of the Offer, I conclude, as a matter of law, that Trinity is not an affiliate for purposes of § 13(e)(3).[40] Plaintiffs' § 13(e) claim is thus dismissed with respect to all defendants.[41]

be selected by "Management"; directors are typically selected by other directors. I suspect that plaintiffs are using the term "Management" imprecisely.

*Second,* and more important, the mere fact that an independent director was selected by an interested director cannot support a charge of director domination, because that is the standard way a person becomes a director. For that reason, courts have rejected such bare allegations of director domination. *See, e.g., Aronson v. Lewis,* 473 A.2d 805, 816 (Del.1984) ("[I]t is not enough to charge that a director was nominated by or elected a the behest of those controlling the outcome of a corporate election. That is the usual way a person becomes a corporate director."), *overruled on other grounds by Brehm v. Eisner,* 746 A.2d 244 (Del.2000).

**39.** In addition, it is far from unusual for an acquirer to retain competent members of management following a business combination.

**40.** Although the existence of a control relationship would generally be considered a question of fact, courts have decided the issue of affiliation as a matter of law where the record is void of any evidence which would demonstrate a control relationship. *See*

*Schwarzschild,* 1992 WL 448796, at *7 (dismissing § 13(e) claim on motion for summary judgment where there was "no material triable issue of fact with respect to whether" acquirer was an affiliate of the target company); *Radol,* 556 F.Supp. at 592 (same). The § 13(e) claims in *Schwarzschild* and *Radol* were dismissed on summary judgment rather than at the pleading stage. However, it would be similarly improper to allow a § 13(e) claim based upon Trinity's status as an affiliate to survive dismissal where plaintiffs have failed to proffer any allegations which would allow a reasonable juror to find that Trinity had the ability to control the policy and decisions of Willis Corroon at the time of the Offer.

Moreover, plaintiffs should not be permitted to use discovery to adduce facts to support their § 13(e) claim. It is well-settled that " 'the purpose of discovery is to find out additional facts about a well-pleaded claim, not to find out whether such a claim exists.' " *Ross v. Mitsui Fudosan, Inc.,* 2 F.Supp.2d 522, 528 (S.D.N.Y.1998) (quoting *Jones v. Capital Cities/ABC Inc.,* 168 F.R.D. 477, 480 (S.D.N.Y. 1996)). *See also Meyer v. Zubak,* 97 Civ. 1393, 192 F.R.D. 105, 2000 WL 145754,*3 (S.D.N.Y. Feb. 8, 2000) ("[T]he purpose of discovery is not to enable [plaintiff] to determine whether he has a viable claim.").

## C. State Law Claims

Pursuant to 28 U.S.C. § 1367(c)(3), a district court may decline to exercise supplemental jurisdiction over state law claims where "the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). Because all of plaintiffs' federal claims are dismissed, I decline to exercise supplemental jurisdiction over plaintiffs' state law claims and find that those claims must be dismissed as well. *See Martinez v. Simonetti,* 202 F.3d 625, 636 (2d Cir.2000) (directing dismissal of supplemental state law claims where no federal claims remained).[42]

## IV. Leave to Amend

 Under Federal Rule of Civil Procedure 15(a), "leave to amend shall be freely granted when justice so requires." Fed.R.Civ.P. 15(a). However, the decision whether to grant leave to amend rests within the sound discretion of the district court. *See Cresswell v. Sullivan & Cromwell,* 922 F.2d 60, 72 (2d Cir.1990). Courts may properly deny amendment where there is evidence of "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc." *See Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962).

Applying these well-settled principles to the instant case, plaintiffs' claims are dismissed without leave to amend. To begin, this Court has twice considered and twice rejected plaintiffs' § 14(e) claim. In particular, I note that almost two years after the challenged transaction plaintiffs are still unable to adequately allege the most basic element of a § 14(e) claim—material misstatement. It is the opinion of this Court that further attempts to plead a claim under § 14(e) would be futile.

Plaintiffs have also been given two chances to successfully plead their § 13(e) claim. True, this claim was set forth for the first time in the amended complaint. However, in their motions to dismiss that Complaint, defendants pointed out the

---

41. Of course, even if Trinity was an affiliate at the time of the Offer such that it was subject to the disclosure requirements of § 13(e), it is unlikely that any of the other defendants would be similarly obligated to make disclosures under the going-private statute which applies only to acquiring issuers or affiliates. Similarly, assuming again that Trinity was an affiliate at the time of the Offer, plaintiffs' § 13(e) claim is still almost certainly meritless because it appears that defendants have, in fact, provided adequate disclosure under the statute.

Briefly, plaintiffs repeatedly contend that defendants violated Rule 13e–3 by failing to procure a written fairness opinion from Deutsche bank. *See, e.g.,* Complaint ¶¶ 39, 43. However, Rule 13e–3 does not require issuers or affiliates to procure a fairness opinion, written or oral. The Rule merely states that if a fairness opinion is obtained, it must be "made available [to shareholders] for inspection and copying." *See* 17 · C.F.R. § 240.13e–100, at Item 9 (citing 17 C.F.R. § 229.1015). Plaintiffs also allege that, contrary to the requirements of Rule 13e–3, de-

fendants "simply stated that the [Offer] was fair and reasonable without supplying the underlying support for their opinion." Complaint ¶ 41. Plaintiffs' assertion, however, ignores the detailed explanation set forth by the independent directors in support of their decision to recommend the Offer. *See* Solicitation, Ex. A to Curnin Aff., at 6–10. Plaintiffs also overlook the fact that much of the information they claim defendants failed to provide, for example the "net book value" of Willis Corroon, can be easily ascertained by reviewing the audited financial statements attached to the Solicitation. *See id.* at 52–78.

42. Because this Court declines to exercise supplemental jurisdiction over plaintiffs' state law claims, it is unnecessary to reach the merits of those claims. Similarly, because plaintiffs' federal and state law claims are dismissed in their entirety, it is unnecessary to address the issue of whether this Court may properly exercise personal jurisdiction over the two Insurance Company Defendants that do not maintain offices in New York—Royal & SunAlliance and Guardian Royal Exchange. *See supra* note 6.

clear error in plaintiffs' § 13(e) claim as pleaded, namely that Trinity, not Willis Corroon, made the challenged tender offer. *See* Defs. Mem. at 13; ICD Mem. at 6; *supra* note 36. In response, plaintiffs set forth a new theory of § 13(e) liability in their opposition brief, arguing that Trinity was an affiliate of Willis Corroon. In keeping with the liberal spirit of Rule 15(a), I treated plaintiffs' affiliate allegations as if they were properly alleged in the Complaint. Accordingly, like their § 14(e) claim, plaintiffs have had two opportunities to plead a claim under § 13(e) and they have failed on both occasions. Additional attempts to state a § 13(e) claim would be unfair and prejudicial to defendants; they would also be unlikely to succeed for the reasons stated *supra* note 41.[43]

More generally, defendants and this Court have already expended a great deal of time and energy addressing plaintiffs' meritless claims. The challenged transaction occurred in September 1998, and plaintiffs have yet to articulate a claim sufficient to survive dismissal. This Court is not required to grant plaintiffs endless opportunity to formulate new theories in response to defendants' arguments and findings by this Court. As the Second Circuit has stated, "[a] busy district court need not allow itself to be imposed upon by the presentation of theories seriatim." *State Trading Corp. of India, Ltd. v. Assuranceforeningen Skuld,* 921 F.2d 409, 418 (2d Cir.1990) (internal quotations omitted). Nor are defendants required to go through yet another round of briefing while plaintiffs cobble together new allegations of liability. Plaintiffs have had two years and at least two bites at the apple. That is more than sufficient under the circumstances presented here.

Finally, as discussed *supra* note 18 and *infra* Part V, plaintiffs and/or their counsel have already raised the specter of bad faith in these proceedings by previously representing to this Court that the tender offer price was fair and reasonable. Where bad faith is apparent, leave to amend may properly be denied. *See Foman,* 371 U.S. at 182, 83 S.Ct. 227. Accordingly, plaintiffs' claims under § 13(e) and § 14(e) are dismissed with prejudice.

## V. Sanctions

Section 21(D)(c) of the PSLRA, entitled "Sanctions for abusive litigation", provides:

> In any private action arising under this chapter, upon final adjudication of the action, the court shall include in the record specific findings regarding compliance by each party and each attorney representing any party with each requirement of Rule 11(b) of the Federal Rules of Civil Procedure as to any complaint, responsive pleading, or dispositive motion.

15 U.S.C. § 78u-4(c)(1). If the court determines that there has been a violation of Rule 11, section 21D(c)(2) imposes mandatory sanctions and adopts a rebuttable presumption that the appropriate sanction for noncompliance "is an award to the opposing party of the reasonable attorneys' fees and other expenses incurred." 15 U.S.C. § 78u-4(c)(3)(A)(i)-(ii).

The dismissal of plaintiffs' claims with prejudice constitutes a "final adjudication"

---

**43.** Moreover, nowhere in their opposition brief or elsewhere have plaintiffs even requested leave to amend their § 13(e) claim. This is a striking omission considering the fact that plaintiffs were on notice as early as December 10, 1999 that their § 13(e) claim was defective as pleaded. Similarly, it is surprising that experienced counsel would set forth critical allegations for the first time in a brief without ever seeking to add those allegations to the Complaint. Finally, plaintiffs' defective § 13(e) claim which named Willis Corroon rather than Trinity as the acquirer and never mentioned a control relationship was either a result of careless drafting or something more disingenuous. It was not caused by lack of information, discovery of new facts or a change in the law. Thus, plaintiffs should have—at minimum—pleaded an affiliate theory of § 13(e) liability the first time around.

under the PSLRA. Accordingly, this Court must make Rule 11 findings as mandated by that statute. Based upon a preliminary review of the record, it seems overwhelmingly likely that Rule 11 was violated in this case. *First*, plaintiffs' § 14(e) claim is not only legally insufficient but appears wholly frivolous, both for the reasons set forth above and in light of my prior opinion which explicitly warned plaintiffs that their § 14(e) claim was "weak" and unlikely to survive dismissal. *See Polar*, 187 F.R.D. at 115.[44] Legally frivolous claims clearly violate Rule 11(b)(2).[45]

*Second*, and more troubling, plaintiffs' counsel may have violated Rule 11(b)(1), which prohibits parties and their counsel from pursuing litigation for any improper purpose, and Rule 11(b)(3), which prohibits parties and their counsel from making unsupported allegations and factual contentions. As described *supra* note 18, little more than one year ago plaintiffs' counsel represented to this Court in both written submissions and during oral argument that the Trinity Offer was neither inadequate nor unfair. Specifically, plaintiffs' counsel unequivocally represented that

> [w]hile Plaintiff originally contended that holders of the ADRs were to receive an inadequate consideration for their holdings, discovery and examination of the documents, methodology, and witnesses adduced no evidence that said consideration was unfair or inadequate. The financial expert engaged by Plaintiff's Counsel has likewise concluded that such consideration is not inadequate and unfair in the circumstances.

Notice of Class Action Determination, Proposed Settlement and Hearing Thereon, Ex. G to 3/3/99 Sporn Aff., at 3. Now, however, plaintiffs' counsel takes precisely the opposite position arguing to this Court that the Trinity Offer is "grossly inadequate" and unfair. An innocent, nonsanctionable explanation for counsel's conflicting assertions to this Court—and to the plaintiff class they purport to represent—has not been offered. Nor is one apparent from the record to date.

Although I strongly suspect sanctions are warranted, section 21(D)(c)(2) requires that "[p]rior to making a finding that any party or attorney has violated Rule 11[,] ... the court shall give such party or attorney notice and an opportunity to respond." 15 U.S.C. § 78u–4(c)(2). Accordingly, plaintiffs and their counsel shall show cause within fourteen days from the date of this Opinion and Order why sanctions should not be imposed under Rule 11. Because sanctions may be imposed against plaintiffs, plaintiffs' counsel or both, any submission must address the conduct of plaintiffs and plaintiffs' counsel independently. Defendants may also file a submission during the fourteen-day time period if they so choose.

## VI. Conclusion

For the foregoing reasons, defendants' motions to dismiss are granted in their entirety. Plaintiffs and their counsel may file any opposition to the imposition of Rule 11 sanctions within fourteen days of this Opinion and Order. If defendants wish to file a submission on the issue of

---

44. Among other things, my prior opinion noted that

> in support of its allegations that defendants misrepresented the performance of [Willis Corroon] in the offering materials, plaintiff cites to statements and information showing that the Company was strong and profitable. Every document on which plaintiff relies, however, is a document publicly disseminated by the Company, which belies the contention that defendants were at-

tempting to misrepresent the condition of the Company.

*Polar*, 187 F.R.D. at 115. Despite this Court's warning and clear legal precedent which states that there is no obligation to disclose information already in the public domain, plaintiff included identically flawed allegations in their amended complaint.

45. For the reasons discussed *supra* Parts III.B. and IV, plaintiffs' § 13(e) claim may also be frivolous in violation of Rule 11.

252

sanctions, they must also do so within four-teen days.

